# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 23, 2012

## STATE OF TENNESSEE v. EDDIE LEROY ROWLETT

**Appeal from the Circuit Court for Stewart County**
**No. 4-1967-CR-08    Larry Wallace, Judge**

---

**No. M2011-00485-CCA-R3-CD - Filed February 26, 2013**

---

The Defendant, Eddie Leroy Rowlett, was convicted by a Stewart County jury of aggravated assault and resisting arrest. Following a sentencing hearing, the trial court imposed an effective six-year sentence. In this direct appeal, the Defendant challenges (1) the denial of his motion to suppress, arguing that the entry into his home and his subsequent detention and arrest violated his Fourth Amendment rights; (2) the sufficiency of the evidence supporting his convictions; (3) several evidentiary rulings, including the admission of certain photographs and limitations on establishing a "criminal trespass" defense; and (4) the jury instructions, arguing that a special instruction should have been given for the State's failure to disclose the deputy's telephone records, and that instructions on self-defense and defense of others should have been included in the final charge to the jury. Because the evidence of serious bodily injury was insufficient, the Defendant's conviction for aggravated assault is reversed and modified to a conviction for Class A misdemeanor assault. The judgment for resisting arrest is affirmed. The case is remanded for resentencing.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court
### Affirmed in Part; Reversed in Part

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined. JEFFREY S. BIVINS, J., filed a separate opinion concurring in part and dissenting in part.

B. Lynn Morton (at trial), Clarksville, Tennessee; William (Jake) B. Lockert, III, District Public Defender, and Drew W. Taylor, Assistant Public Defender (on appeal), for the appellant, Eddie Leroy Rowlett.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Dan M. Alsobrooks, District Attorney General; and Suzanne Lockert-Mash, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

This case arises from an officer-involved shooting that occurred at the Defendant's residence during the early morning hours of September 25, 2006. The Defendant allegedly assaulted the officer, and ultimately, the officer shot the Defendant to halt the Defendant's advances. As a result of these events, a Stewart County grand jury returned a three-count presentment against the Defendant, charging him with one count of aggravated assault causing serious bodily injury, one count of aggravated assault by display of a deadly weapon, and one count of resisting arrest. See Tenn. Code Ann. §§ 39-13-102, -16-602.

Motion to Suppress. The Defendant filed a motion to suppress the evidence on July 28, 2008. Therein, the Defendant argued that his seizure and subsequent arrest were not supported by probable cause and, thus, were in violation of his Fourth Amendment rights. He also submitted that he revoked any consent to enter his residence, and Deputy Saltkill did not comply with his request to leave, violating his constitutional rights. The State filed a response, claiming that there was no unlawful seizure or arrest of the Defendant. A hearing was held on February 13, 2009.

At the hearing, Chris Summers testified that he was a paramedic with Stewart County Emergency Medical Services ("EMS"). Shortly before midnight, he and his partner responded to a 9-1-1 call from the Defendant's residence of "difficulty breathing, shortness of breath." Once inside the residence, they located the Defendant sitting on a couch, "explaining how he felt, how he was breathing and so forth, calm at first."

Upon further questioning, the Defendant requested a breathing treatment. Summers informed the Defendant of EMS policy to transport patients to the hospital after administering a treatment. Summers, having knowledge of a recent visit by another EMS crew, told the Defendant that they "could not keep coming out [t]here to administer breathing treatments to him . . . and then leave." Summers recommended that the Defendant be transported to the hospital. Summers then phoned his supervisor and received permission to administer the treatment to the Defendant, still hoping to transport the Defendant thereafter.

After the breathing treatment was given, the Defendant said that his breathing was getting better. Summers and his partner tried, to no avail, to get the Defendant to accompany them to the hospital anyway. The Defendant became "very belligerent, angry." As Summers' partner removed the blood pressure cuff from the Defendant, the Defendant stood up and said, "I'm going to whoop your ass." In the process of standing up, the Defendant

"slightly shoved" Summers' partner. Believing the scene to be unsafe, they proceeded to pack up their equipment "and get out as quick as possible."

Summers testified that he did not yell at the Defendant's wife at any point during the episode. When asked if the Defendant threatened his wife at any time while they were inside the residence, Summers replied, "He pointed out to her very loudly" that it was her fault because she "was the one that called 9-1-1 for [them] to come out here. [She was] the one who started all this." Both Summers and his partner believed the Defendant's wife "could possibly be in some kind of spousal abuse." They were concerned that "some kind of altercation may take place if [they] did not say or do something to report this in any kind of way." They were also worried about future EMS calls to that residence, so they radioed dispatch and advised of the situation that had just occurred at the Defendant's residence and requested an officer to accompany EMS personnel on all future calls.

They then met with Deputy Dana Saltkill, who had been monitoring the radio, at "EMS Station 2" to explain the events. Summers told Deputy Saltkill how the situation had escalated at the Defendant's residence and expressed his concern for the Defendant's wife, requesting a "welfare check" be conducted. Following the events of the evening, Summers made an incident report of the evening's events.

On cross-examination, Summers stated that anxiety often accompanies shortness of breath. Summers also said that the Defendant did not want to be transported because he did not have medical insurance and could not afford the expense. Summers estimated that his visit to the Defendant's residence lasted about thirty minutes.

According to Summers, his partner participated in the previous call to the Defendant's residence, and on that occasion, a breathing treatment was not administered. Summers confirmed that neither he nor his partner wanted to take out a warrant against the Defendant based upon his behavior that evening when they met with Deputy Saltkill.

Deputy Saltkill, a deputy with the Stewart County Sheriff's Department, testified that he met with EMS, who stated their concern for Mrs. Rowlett and their desire for Deputy Saltkill to conduct a welfare check at the residence. Deputy Saltkill explained that a welfare check "is to make sure there's no domestic violence going on at that residence." Deputy Saltkill stated that he was familiar with the Defendant and his "past domestic assaults on Mrs. Rowlett."

Deputy Saltkill testified that Chris Summers informed him that the Defendant "got very angry at them and started pushing them out the door." According to what Summers told Deputy Saltkill, they were in fear of the Defendant, so they left the Defendant's residence

quickly and contacted dispatch for police assistance. Summers also requested Deputy Saltkill "to go out there and talk to [the Defendant] and just tell him the next time an EMS unit comes out there, also that the police were going to come out there too." After speaking with EMS, Deputy Saltkill went immediately to the Defendant's residence.

According to Deputy Saltkill, he "drove in the driveway" of the Defendant's residence and turned his "lights out." He then exited his vehicle and started walking "up to the trailer looking around and just to see what's going on." He observed "a possible light on in the living room" and walked up to the porch and knocked on the front door. According to Deputy Saltkill, the Defendant answered the door dressed in boxer shorts. Deputy Saltkill informed the Defendant that, based upon his talk with EMS personnel, he "was there to check on him and make sure everything was all right."

According to Deputy Saltkill, at the outset of their conversation, the Defendant was polite and invited Deputy Saltkill inside. Deputy Saltkill testified, "I told him I was there to check on him and he said, come on in." Once inside the residence, Deputy Saltkill was able to observe Mrs. Rowlett, who was in the kitchen; he did not talk to Mrs. Rowlett at that time. Deputy Saltkill inquired about the prior incident with EMS, and the Defendant "started getting agitated" and yelled at Deputy Saltkill. The Defendant then turned and yelled at his wife, "you better not ever call the ambulance again because I will sit here and die." Deputy Saltkill explained that the EMS was there "trying to help" him and that he did not "need to push them out the door."

At this time, the Defendant "started coming towards" Deputy Saltkill. The Defendant got "probably about a foot away" from Deputy Saltkill and "stuck his finger" in Deputy Saltkill's face, "just yelling." Deputy Saltkill then asked the Defendant "to back up" because, knowing about the Defendant's past history of violence, Deputy Saltkill did not want the Defendant that close to him. Deputy Saltkill testified that the Defendant did not "back up," so he told the Defendant, "if you don't back up. I'm going to back you up." The Defendant finally complied.

Shortly thereafter, the Defendant began "getting furious" with Deputy Saltkill. Deputy Saltkill testified that the Defendant said for him "to get the f--k out of his house and went to the door." Deputy Saltkill "was kind of angled at the door and between [the Defendant]," and as the Defendant headed towards the door, his shoulder hit Deputy Saltkill's, shoving him. Deputy Saltkill did not arrest the Defendant at that time. The Defendant was still belligerent towards Deputy Saltkill, who continued to ask the Defendant to calm down. The Defendant opened the door and again told Deputy Saltkill to get out of the house. The Defendant said to Deputy Saltkill, "I told the guys out earlier I'd whoop their

a-s and I've done whooped a 400 pound n----r's a-s and I'm going to whoop yours." The Defendant was now between Deputy Saltkill and the door.

The Defendant then "took a blatant stance raising his hands up" and hit Deputy Saltkill "in the left chest area," pushing Deputy Saltkill backwards. Deputy Saltkill then informed the Defendant to get on the ground, that he was going to arrest him and take the Defendant to jail.

Deputy Saltkill pulled out his taser and called dispatch, requesting "backup." The Defendant picked up a computer chair, using it as shield, and asked Deputy Saltkill not to shoot him with the taser. The Defendant began "backing up," still disobeying Deputy Saltkill's commands. Deputy Saltkill testified that he was afraid of being assaulted with the chair. Deputy Saltkill attempted to discharge his taser, but it malfunctioned. When Deputy Saltkill "started advancing on" the Defendant, the Defendant threw down the chair and went inside a bedroom.

Deputy Saltkill asked Mrs. Rowlett if the Defendant had any weapons in the bedroom, and Mrs. Rowlett stated, "yes, a knife." The Defendant emerged from the bedroom in "[a] matter of seconds," and Deputy Saltkill noticed "something wrapped around [the Defendant's] right fist." Deputy Saltkill believed the item was a belt. The Defendant grabbed another chair, and by this time, Deputy Saltkill had transitioned to his handgun. The Defendant continued to approach Deputy Saltkill with the chair in front of him. Once the Defendant was "about a foot away from" Deputy Saltkill, the Defendant dropped the chair. Deputy Saltkill then tried to kick the Defendant "in the groin to get him back away from [him]." At this time, the Defendant "came around" and hit Deputy Saltkill in his left eye. Deputy Saltkill stated that he "was fixing to pass out because of the pain." The Defendant continued advancing towards Deputy Saltkill, so Deputy Saltkill shot the Defendant once, halting the advance. According to Deputy Saltkill, "this occur[red]" in "a matter of minutes," "no more than three minutes total."

On cross-examination, Deputy Saltkill was asked if he had any intent to arrest the Defendant when he arrived at the residence, and Deputy Saltkill said, "No. My only intent was to check on [Mrs. Rowlett] and do an investigation on assaulting the . . . other EMS." Deputy Saltkill confirmed that neither of the EMS personnel wanted to take out a warrant against the Defendant for assault. Deputy Saltkill explained, "But any time there is an assault, there's a follow-up. If I can find a person to talk to and ask them what went on, I'm going to go out there and talk to him." Deputy Saltkill continued, "I was just going to advise [the Defendant] and let him know if [EMS] come out [t]here next time not to be putting his hands on them because the police was going to be out there with them."

Deputy Saltkill agreed that if the Defendant would not have answered the door when he knocked, then "there wouldn't have be[en] anything" he could have done. Further, Deputy Saltkill agreed that any contact with the Defendant "from the very beginning was voluntary."

Deputy Saltkill acknowledged that the Defendant was clear when he instructed him to leave, but because the Defendant "was so angry," Deputy Saltkill was unsure what the Defendant "would have done to his wife." Deputy Saltkill stated that he told the Defendant he was going tell him "one more thing before [he] left," in an attempt to defuse the situation. The Defendant continued to insist that Deputy Saltkill leave, but Deputy Saltkill was going to stay because he wanted to talk to Mrs. Rowlett. Once Deputy Saltkill decided to arrest the Defendant, he was "not leaving that house." Deputy Saltkill said that he remained at the front door area once invited inside.

Deputy Saltkill estimated that only fifteen seconds elapsed from the time the Defendant took "the defensive stance" until he shot the Defendant. Deputy Saltkill testified that everything "happened real quick." According to Deputy Saltkill, the Defendant did not "give [him] a chance to even talk to [Mrs. Rowlett]."

At the conclusion of the hearing, the trial court overruled the Defendant's motion, reasoning as follows:

> After considering all the circumstances involved in the case, . . . an officer needs to have the ability to be able to find out if someone is in danger. And based on the officer's information at that time, he went to the house on a valid belief that there might have been some danger for Mrs. Rowlett and wanted to inquire about the assault, even though the EMS wasn't going to press charges.
>
> At that point in time, when he went to investigate or find out as a caretaking role what was going on, the situation with Mr. Rowlett obviously escalated to where we find ourselves today. At that point in time, it ended up being an assault eventually by Mr. Rowlett upon the officer and, unfortunately, resulted in the circumstances in which we find ourselves. So, any time there's a situation like this, it's always an unfortunate situation, but the [c]ourt finds that there's not enough evidence to suppress the arrest, therefore, the motion is respectfully denied in all respects.

A written order denying the motion was entered on May 12, 2009. The case proceeded to trial.

-6-

Trial. The evidence presented at trial revealed the following facts. Louella Rowlett testified that late in the evening on September 24, 2006, she phoned 9-1-1 because her husband, the Defendant, was having trouble breathing. She acknowledged that in the prior "week or two," EMS had come to their home and explained that "they couldn't just treat, they had to treat and transport." During her call to 9-1-1 on September 24, 2006, she stated her desire that the Defendant not be transported to the hospital. A recording of this call was played for the jury.

Stewart County EMS personnel, Chris Summers and his partner Justin Zellers, arrived at the Defendant's residence between 11:30 p.m. and midnight that evening. Zellers had been involved in the prior call to the Defendant's residence one week earlier. On that prior call, they did not treat the Defendant.

Upon their arrival on September 24, 2006, the Defendant was experiencing breathing difficulties, and he requested the administration of Albuterol medication. The Defendant again stated his desire not to be taken to the hospital due to his lack of medical insurance, and the EMS again relayed their policy to take a patient to the hospital following treatment on the scene. Eventually, they contacted their supervisor to get approval to give the Defendant a breathing treatment. After receiving approval, they administered the medication and checked the Defendant's vital signs. According to Zellers, the Defendant "appeared to be breathing better." They again requested that the Defendant accompany them to the hospital, and then "it escalated to [where the Defendant] was getting more agitated."

The Defendant, who said he had been drinking that evening, became violent. Mrs. Rowlett stated that the Defendant told the paramedics "to get the f--k out of [his] house" after "they were getting onto [her]" for calling them. Zellers testified that they never admonished Mrs. Rowlett and that the Defendant began making threats following their repeated requests for him to accompany them to the hospital. As Zellers was "taking the BP cuff off" the Defendant, the Defendant "shoved [Zellers] out of the way." Summers said that the Defendant told them, "If you don't get out of here right now, I'm going to whoop both of you're a-ses right now." According to Summers, the Defendant "proceeded to shove [them] out the door." They quickly gathered their supplies and left. The entire encounter lasted approximately thirty-eight minutes.

Zellers explained that at some point during the incident, the Defendant began to criticize Mrs. Rowlett, blaming her for the EMS' presence in their home because she had been the one to call for medical assistance. Zellers described the Defendant as "yelling" at Mrs. Rowlett. After leaving the Defendant's home, they contacted dispatch for a "welfare check" on the Defendant's residence, believing the Defendant's "wife could very well be in

danger." They also requested that police accompany EMS personnel on any future visits to the Defendant's home. Recordings of these calls were played for the jury.

Deputy Saltkill responded to the EMS' call for a check on the Defendant's residence "for some kind of domestic dispute." The EMS were concerned for Mrs. Rowlett. Summers and Zellers met with Deputy Saltkill at an EMS station and relayed the events that had occurred earlier that evening. Deputy Saltkill testified that Summers reported to him that the Defendant had "put his hands on him and pushed him out the door." Deputy Saltkill then proceeded to the Defendant's home.

Deputy Saltkill provided trial testimony similar to that he gave at the suppression hearing about the events occurring inside the Defendant's home. Deputy Saltkill described his injury at trial as follows. He said that the Defendant "coldcocked" him in the eye with "some type [of] an item wrapped around his hand" and that the hit was "so hard" that his knees "buckled." He was "dazed" after the hit. The hit caused lacerations "to the eyelid" and nose, with blood "pouring out of" the eye, and he could not see out of it. Deputy Saltkill testified that he experienced "pretty high" pain after being hit in the face by the Defendant.

An ambulance was called to the scene to tend to Deputy Saltkill's injury. EMS "cleaned up [the] eye," and Deputy Saltkill began to "see out of it a little bit better." He was not transported to the hospital and returned to the sheriff's office a few hours after the incident.

Photos of Deputy Saltkill's eye were admitted into evidence, over objection from the defense. Approximately thirteen photos of the eye were entered in total, and the photos spanned several days, showing how the injury progressed over time. Deputy Saltkill testified that, over the next few days, his eye was "swollen." He further explained that he lost sight in the eye for one night because it was "swollen shut."

In addition to EMS personnel who tended to the Defendant and Deputy Saltkill, numerous other law enforcement officials arrived on the scene. Deputy Daren Taylor with the Stewart County Sheriff's Department responded to the call for backup and was the first to arrive on the scene. Deputy Taylor estimated that he arrived within "[t]hree to four minutes max." Upon entering the Defendant's residence, he observed Deputy Saltkill with his weapon drawn and then saw the injury to Deputy Saltkill's face. According to Deputy Taylor, Deputy Saltkill asked him "to keep the male subject on the floor," and Deputy Saltkill appeared as if "he was about to pass out." Deputy Saltkill exited the residence. When EMS arrived shortly thereafter, Deputy Taylor "holstered [his] weapon."

After the Defendant had been transported from the home, Deputy Taylor took a statement from Mrs. Rowlett. Deputy Taylor denied using force or threats in getting a statement from Mrs. Rowlett and denied that he told her what to say. He further denied speaking with Deputy Saltkill before taking the statement from Mrs. Rowlett. Mrs. Rowlett's statement was admitted into evidence, which statement provides as follows:

> The deputy came to the door, and was asking Eddie about what went on earlier with the EMS guys. The deputy was trying to explain that they were there to help him and that he shouldn't have got an attitude and pushed them out the door. Eddie started to get angry and told the deputy to get out of the house. Eddie got angrier and started to get up in the deputy's face. The officer told him to back down, that's when I think Eddie pushed or hit him, and he pulled out his taser. Eddie picked up a chair and started to back up toward the bedroom and shut the door. The officer asked me if he had any weapons. I told him he had a knife. Eddie came toward him and hit the officer in the eye. That's when the officer shot him.

Deputy Taylor described Mrs. Rowlett's demeanor following the incident as "just no emotion." Deputy Taylor also stated that, after writing the statement, Mrs. Rowlett inquired about Deputy Saltkill's well-being following the attack. Mrs. Rowlett then asked if she could go back inside to check on her child. According to Deputy Taylor, Mrs. Rowlett never asked to leave the residence to be with her husband.

Also present on the scene that evening were Andrew Washington, an officer with the Stewart County Sheriff's Department; John Vinson, the Sheriff of Stewart County; and Deryk Wyatt, Chief Deputy of the Stewart County Sheriff's Department. Sheriff Vinson went to the scene and, thereafter, contacted the Tennessee Bureau of Investigation ("TBI") for assistance with the investigation. According to Sheriff Vinson, Mrs. Rowlett also asked him about Deputy Saltkill. Sheriff Vinson said that Mrs. Rowlett "appeared to be fine" and that she never requested to leave the residence. Chief Deputy Wyatt also testified that Mrs. Rowlett asked how Deputy Saltkill was doing. According to Chief Deputy Wyatt, if Mrs. Rowlett had asked to be transported to the hospital to see her husband, then they would have made arrangements for her transportation. Chief Deputy Wyatt testified that the sheriff's department deferred the investigation to the TBI.

Chief Deputy Wyatt described the radio dispatch system for the jury. Multiple recordings of radio transmissions and telephone calls going into and out from dispatch, involving EMS personnel, various deputies, and officers, during the relevant time frame were played for the jury and admitted into evidence. During several of these "different

transmissions," different "individuals [were] talking about the inability to transmit" from the Defendant's residence.

At approximately 3:50 a.m., TBI Agent Derrick Jones arrived at the scene to conduct an investigation of the shooting. He spoke with Deputy Saltkill and collected evidence from the scene. Agent Jones also reviewed Mrs. Rowlett's written statement, took statements from Deputies Saltkill and Taylor, and received a report from Chief Deputy Wyatt. Agent Jones recounted Deputy Saltkill's statement for the jury. Also, EMS workers Summers and Zellers gave statements to Agent Jones, which statements were admitted into evidence. Agent Jones later went to the hospital and visited the Defendant. While there, he took a picture, which was admitted into evidence, of the Defendant's right hand, showing "some scabs or injuries . . . on the knuckle area." Ultimately, Agent Jones concluded that the shooting was "justified."

The Defendant testified on his behalf and denied ever hitting Deputy Saltkill. First, the Defendant claimed that he was never angry with his wife while the EMS personnel were inside his home. According to the Defendant, "when they were taking the thing off my arm, [they] actually tried to lift me up to tell me to come on, . . . I was going" to the hospital. The Defendant said to the EMS, "[G]et off me." The Defendant testified that the EMS personnel then turned to Mrs. Rowlett and said, "[L]ook, lady, you know, we're not his baby sitter. Don't be calling us out here." The Defendant did not like the way they spoke to his wife, so he told them to "get the eff out of [his] house." They left. The Defendant claimed that there "wasn't any contact at all" with the EMS.

The Defendant denied that he ever gave Deputy Saltkill permission to enter his home. According to the Defendant, Deputy Saltkill knocked on the front door, said "Stewart County Sheriff's Department," opened the door, and "stepped on in." Once he was inside, they discussed the prior situation with EMS. The Defendant then told Deputy Saltkill he needed to leave, and Deputy Saltkill said "that he would leave whenever . . . he decided to leave and that [the Defendant] needed to listen to what he had to say."

According to the Defendant, this discussion continued for five or six more minutes, after which the Defendant "started to step up and open" the front door. Deputy Saltkill ordered him "to back up, get out of his face or he would back [him] up." Shortly thereafter, the Defendant, who was dressed in only his boxer shorts, told Deputy Saltkill to "get the eff out of [his] house because" he was going to bed. He denied ever pushing Deputy Saltkill. Instead, according to the Defendant, Deputy Saltkill "shoved" him "so hard" that he "flew backwards." Deputy Saltkill then pulled out his taser. The Defendant retreated to his bedroom but emerged quickly once he realized his son was inside the bedroom. The Defendant denied having anything in his hands when he exited the bedroom. He claimed that

-10-

he told Deputy Saltkill he wanted "to give up," but Deputy Saltkill responded "he didn't give an eff." According to the Defendant, he was attempting to leave the residence through the back door when he was shot. The Defendant testified that, after being shot, Deputy Saltkill said to him, "[S]tay down or I'll blow your head off." The Defendant asked Deputy Saltkill why he shot him, and Deputy Saltkill replied "that he was in fear of his life."

The Defendant denied ever touching Deputy Saltkill. According to the Defendant, he did not see any injury to Deputy Saltkill's eye after the shooting. The Defendant alluded to "an altercation in high school" with Deputy Saltkill as a possible motivation for the shooting. The Defendant also recounted an incident where Deputy Saltkill pulled him over for speeding and arrested him for driving on a suspended license, but his "license was good."

In addition to the Defendant's testimony, Mrs. Rowlett, who was declared a hostile witness for the State, gave a similar recount of the events as that of the Defendant. According to Mrs. Rowlett, when Summers and Zellers returned to her house following the shooting, they said to the Defendant, "[W]ell, are you going to act right now." Mrs. Rowlett testified that the Defendant replied to the EMS, "I'm sorry I cussed out you boys; can you help me?" Mrs. Rowlett also testified that, after her husband had been transported from the home, she "asked anybody that was there" if she could leave to go be with her husband. She claimed that she was upset and that they told her she could not leave until she gave a statement. She denied ever asking anyone how Deputy Saltkill was doing. Additionally, Mrs. Rowlett claimed that Deputy Taylor told her what to write and denied much of the contents of the statement she gave to Deputy Taylor.

Both Rowletts admitted that they had a pending civil suit against Deputy Saltkill and the Stewart County Sheriff's Department based on these events. In that lawsuit, they were asking for damages in the amount of five million dollars.

Following the conclusion of proof, the jury found the Defendant guilty in Count 1 (aggravated assault causing serious bodily injury), not guilty in Count 2 (aggravated assault by display of a deadly weapon), and guilty in Count 3 (resisting arrest). The trial court imposed a five-year and six-month sentence for the aggravated assault conviction and a consecutive term of six months for the resisting arrest conviction, resulting in an effective six-year sentence in incarceration. This appeal followed.

ANALYSIS

On appeal, the Defendant raises multiple issues for our review: (1) whether the trial court erred in denying his motion to suppress; (2) whether the evidence was sufficient to

support his convictions; (3) whether the trial court erred in several evidentiary rulings; and (4) whether the trial court erred in its instructions to the jury.[1] We will address each in turn.

### I. Motion to Suppress

The Defendant argues that his suppression motion was improperly denied. The Defendant submits that Deputy Saltkill's entry into his home violated his Fourth Amendment protections, specifically that Deputy Saltkill's entry was not justified under the community-caretaking or emergency aid exceptions to the warrant requirement. Alternatively, the Defendant contends that if Deputy Saltkill was legitimately inside the home based upon the Defendant's initial consent, the Defendant thereafter unequivocally withdrew that invitation. According to the Defendant, the encounter was no longer consensual, and his subsequent detention and arrest violated his constitutional rights.

First, the State correctly notes that the Defendant has failed to provide citations to the record in the argument section of his brief. Our rules require that each issue raised by a defendant contain "citations to the authorities and appropriate references to the record." Tenn. R. App. P. 27(a)(7)(A); see also Tenn. R. Crim. P. 10(b). . While the Defendant risked waiver, the Defendant did provide citations to the record in the "statement of the facts" section of his brief, and the technical record includes everything necessary for our review. We, therefore, choose to address this issue on its merits.

Addressing the merits of the issue, the State responds that the trial court properly denied the Defendant's motion to suppress since the initial encounter between Deputy Saltkill and the Defendant was consensual, noting that "courts have upheld the 'knock and talk' procedure as a consensual encounter, as well as a means to request consent to search a residence." The State continues that the Defendant invited Deputy Saltkill into his home and that the Defendant's subsequent detention and arrest were supported by probable cause.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and

---

[1] For the purpose of clarity, we have reordered and combined several of the issues as presented by the Defendant in his brief.

legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. Meeks, 262 S.W.3d at 722.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. CONST. amend. IV; TENN. CONST. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729. These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)).

Courts have generally recognized the right of police officers to enter portions of a person's property that are implicitly open to the public for purposes of seeking an individual's consent to perform a search, and furthermore this court has expressly "recognize[d] that 'it is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business.'" State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) (quoting 1 Wayne R. LaFave, Search and Seizure § 2.3(b) (3d ed. 1996)). Police officers conducting official business have the same rights as members of the general public, and as such they may enter any area of a person's property into which the general public is implicitly invited for purposes of pursuing legitimate business or social interests—such as a sidewalk or pathway leading from a public street to the front door of a residence—because individuals do not have a legitimate expectation of privacy in such areas. See, e.g., State v. Harris, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995) ("What an officer sees from a vantage point along the walkway between the public road and the front door is not protected by either the Fourth Amendment or the state constitution."); State v. Baker, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981) ("It cannot be said a person has an expectation of privacy in the area in the front of his residence which leads from the public way to the front door.").

The "knock and talk" procedure is considered to be a consensual encounter with the police and a means for police officers "to request consent to search a residence." Cothran, 115 S.W.3d at 521. In explaining the procedure and the reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).

It is clear from the record that Deputy Saltkill had a legitimate investigative purpose for knocking on the front door of the Defendant's residence to speak with those inside. Deputy Saltkill simply went to the Defendant's front door to conduct a consensual interview, commonly referred to as a "knock and talk." He testified he was concerned for Mrs. Rowlett's welfare and wanted to inquire about the prior incident with EMS workers. According to Deputy Saltkill, the Defendant thereafter consented to Deputy Saltkill's entry into his home.

In this case, the issue of consent is almost entirely a matter of credibility. As previously mentioned, credibility determinations belong to the trial court. Here, the trial court accredited Deputy Saltkill's testimony that the Defendant voluntarily and intelligently provided consent to enter the Defendant's home. The evidence in the record does not preponderate against the trial court's finding. Accordingly, Deputy Saltkill did not violate the Defendant's constitutional rights by knocking on his front door and entering his residence upon invitation.[2]

The Defendant contends that his encounter with Deputy Saltkill was no longer consensual when he asked Deputy Saltkill to leave. Consent can be limited in time, duration, area, and intensity, and it may be revoked at any time. See State v. Troxwell, 78 S.W.3d 866, 871 (Tenn. 2002) (citing Florida v. Jimeno, 500 U.S. 248, 251 (1991)). Whether a search is authorized by warrant or by consent, the scope of the search is limited by the terms of its authorization. See id. Moreover, if the consent is voluntary, evidence seized in the

---

[2] Given our finding of entry by consent, we deem it unnecessary to address the community-caretaking or emergency aid exceptions to the warrant requirement.

search will not be admissible if the search exceeds the scope of the consent given. Id. (citing 3 Wayne R. LaFave, Search and Seizure § 8.1(c) (3d ed. 1996)). The scope of consent is not based on the subjective intentions of the consenting party or the subjective interpretations of the searching officer. Id. at 871-72. Instead the standard is "that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect." Id. at 872 (citing Florida v. Jimeno, 500 U.S. at 251).

The Defendant maintains that, even if he gave oral consent to Deputy Saltkill's entry, he immediately revoked that consent, and his subsequent detention and arrest were invalid. Our supreme court has stated, "[W]arrantless felony arrests inside a home are generally prohibited by the Fourth Amendment absent probable cause and exigent circumstances." Henning, 975 S.W.2d at 300 (citing Payton v. New York, 445 U.S. 573, 583-90 (1980); State v. Clark, 844 S.W.2d 597, 599 (Tenn. 1992)); see State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005). "Probable cause exists if the facts and circumstances within the officer's knowledge at the time of the arrest, and of which the officer 'had reasonably trustworthy information sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" Henning, 975 S.W.2d at 300 (quoting Beck v. Ohio, 379 U.S. 89 (1964)).

Once voluntary consent to search is given, it continues until it is revoked or withdrawn. Deputy Saltkill testified that he told the Defendant that he "was there to check on him," and the Defendant said, "[C]ome on in." After entering, Deputy Saltkill was able to observe Mrs. Rowlett and asked the Defendant about the prior incident with EMS. The Defendant became agitated at this time. He "started coming towards" Deputy Saltkill, and after getting "about a foot away" from Deputy Saltkill, "stuck his finger" in Deputy Saltkill's face, "just yelling." The Defendant began "getting furious" with Deputy Saltkill and ordered Deputy Saltkill "to get the f--k out of his house and went to the door." As he did so, his shoulder hit Deputy Saltkill's, shoving him. Deputy Saltkill attempted to get the Defendant to calm down, but the Defendant was now between Deputy Saltkill and the door. After saying to Deputy Saltkill, "I told the guys out earlier I'd whoop their a-s and I've done whooped a 400 pound n----r's a-s and I'm going to whoop yours," the Defendant hit Deputy Saltkill "in the left chest area," pushing him backwards. Deputy Saltkill then attempted to arrest the Defendant for assault. Deputy Saltkill testified that everything "happened real quick." According to Deputy Saltkill, "this occur[red]" in "a matter of minutes," "no more than three minutes total."

Even if the Defendant withdrew his consent when he asked Deputy Saltkill to leave, he did so after becoming belligerent with Deputy Saltkill and while simultaneously assaulting Deputy Saltkill by hitting him in the shoulder. Things very quickly escalated to the point where Deputy Saltkill attempted, based upon probable cause, to arrest the Defendant for

-15-

assault.  See Tenn. Code Ann. § 39-13-101(a)(3) "A person commits assault who "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.")  All of the events occurred near the front door of the residence.  The entire episode lasted only a matter of minutes and did not exceed the scope of the Defendant's voluntary consent to enter his home to discuss the events of that evening.  Thus, the Defendant revoked his consent too late to affect the validity of his subsequent detention and arrest.

## II. Sufficiency of the Evidence

The Defendant contends that the evidence at trial is insufficient to sustain his convictions. According to the Defendant, he acted in self-defense: "The proof is clear that the [Defendant] was in his home recovering from an asthma attack when Deputy Saltkill entered his home uninvited and began to lecture the [Defendant]. The proof presented at trial indicates that the [Defendant] simply acted to defend himself against the actions of the Deputy."  The Defendant does not point to a specific element of any offense that the State failed to prove but asserts that he was acting in self-defense.  The State responds that it presented sufficient evidence to support the Defendant's convictions.  Therefore, we will address both the sufficiency of the evidence to establish the elements of the offenses for which the Defendant stands convicted and the sufficiency of the evidence to establish that the Defendant was not acting in self-defense. See, e.g., State v. Brandon Trent Patterson, No. M2010-01573-CCA-R3-CD, 2012 WL 826604, at *5 (Tenn. Crim. App. Mar. 9, 2012) (although defendant's sufficiency argument raised only the claim that he was acting in self-defense, this court addressed both the elements of the offense and the evidence that the defendant was not acting in self-defense); State v. John D. Pass, E2000-02266-CCA-R3-CD, 2001 WL 1523352, at *4 (Tenn. Crim. App. Nov. 30, 2001) (likewise engaging in a review of both the sufficiency of the evidence to establish the elements of the offense and the sufficiency of the evidence to establish that the defendant was not acting in self-defense), perm. app. denied, (Tenn. May 13, 2002).

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the

defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

*A. Aggravated Assault*

In this case, the Defendant was convicted of aggravated assault. As relevant here, aggravated assault is defined as follows: "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [c]auses serious bodily injury to another[.]" Tenn. Code Ann. § 39-13-102(a)(1)(A). According to Tennessee Code Annotated section 39-13-101, "[a] person commits assault who: (1) Intentionally, knowingly or recklessly causes bodily injury to another; (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Tenn. Code Ann. § 39-13-101(a). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2). "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) A broken bone of a child who is eight (8) years of age or less[.]" Tenn. Code Ann. § 39-11-106(a)(34).

The evidence in this case proves that the Defendant intentionally or knowingly caused bodily injury to Deputy Saltkill, hitting him in the face. We turn to address whether Deputy Saltkill suffered "serious bodily injury." Although not specifically addressed by the Defendant, the State contends that the record establishes that the victim suffered serious bodily injury in the following enumerated categories: extreme physical pain; obvious disfigurement; and protracted loss or substantial impairment of a function of a bodily member or organ. See Tenn. Code Ann. § 39-11-106(a)(34)(C-E).

The Tennessee Supreme Court recently discussed the statutory definition of "serious bodily injury" when it addressed whether a gunshot wound that passed through the victim's leg constituted "serious bodily injury." See State v. Farmer, 380 S.W.3d 96, 100-03 (Tenn. 2012). The court ultimately concluded that the gunshot wound did not meet the statutory definition of "serious bodily injury" because the injury, as it occurred, did not involve a substantial risk of death, the victim did not lose consciousness, the victim did not suffer extreme pain, and because nothing in the victim's testimony supported an inference that his injury involved protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty. See id. We conclude that this case is indistinguishable from Farmer.

First, the State asserts that the victim suffered from extreme physical pain as a result of the injuries he received at the hands of the Defendant, pointing to Deputy Saltkill's testimony that the "[p]ain was pretty high, especially the nose area . . . . " In Farmer, our supreme court cited with approval this court's opinion in State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995). In Sims, acknowledging the difficulty of quantifying physical pain, we used the ejusdem generis canon of statutory construction to determine that the pain necessary to establish serious bodily injury via extreme physical pain "must be enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." Id. We held that the pain associated with the injury suffered by the victim in that case, a broken nose, did not qualify as "extreme physical pain" for purposes of the definition of serious bodily injury. In so holding, the Sims court reasoned that the pain associated with the injury was not extreme enough to be included in a class of injury that involved a substantial risk of death, protracted unconsciousness, permanent disfigurement or protracted loss, or substantial impairment of loss of a body part or mental faculty.

Deputy Saltkill testified that the Defendant "coldcocked" him in the eye with "some type [of] an item wrapped around his hand." The hit was "so hard" that it "buckled" Deputy Saltkill's knees. He had lacerations "to the eyelid" and to his nose. According to Deputy Saltkill, "[b]lood started pouring out of" the eye, and he could not see out of it. He was "dazed" after the hit. Although an ambulance was called to the scene to tend to Deputy Saltkill's injury, he was not transported to the hospital. EMS "cleaned up [the] eye," and Deputy Saltkill began to "see out of it a little bit better." He returned to the sheriff's office a few hours after the incident.

As in Farmer, the evidence in the instant case does not support a finding that Deputy Saltkill's injury involved a degree of pain that would warrant its inclusion among the other enumerated portions of the definition of "serious bodily injury." Although Deputy Saltkill testified that he experienced "pretty high" pain after being hit in the face by the Defendant, medical care was administered at the scene, and he was not taken to the hospital. In fact, he returned to the sheriff's office within a few hours. A jury could not reasonably infer from Deputy Saltkill's testimony and the nature of his injury that the wound involved extreme pain.

The State also asserts that Deputy Saltkill's injury qualified as protracted or obvious disfigurement because the area around his eye was "heavily swollen and bruised for several days." However, we cannot agree, finding this court's analysis in State v. David Earl Scott persuasive "that bruising alone can[not] qualify as disfigurement for purposes of Code section 39-11-106 because that section specifically includes bruising in the definition of

-18-

'bodily injury.'" No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *7 (Tenn. Crim. App. Nov. 14, 2012) (citing Tenn. Code Ann. § 39-11-106(4)), perm. app. filed, (Jan. 14, 2013). "Because bruising is specifically included in the statutory definition of bodily injury among a class of injuries that also includes 'disfigurement,' it cannot be included in the more general term 'disfigurement' in the definition of serious bodily injury." Id. Accordingly, we disagree with the State and conclude that Deputy Saltkill's swollen and bruised eye does not satisfy the requirement of "protracted or obvious disfigurement" to establish serious bodily injury.

Finally, the State claims that Deputy Saltkill's loss of vision for one night and that his "swollen shut" eye establishes a "protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Again, we disagree. Protracted means "delayed or prolonged in time." See Scott, 2012 WL 5503951, at *6. Deputy Saltkill's injury, including loss of sight for no more than one night, was not protracted. Moreover, nothing in the record supports a conclusion that the function of the victim's bodily members was substantially impaired. Indeed, he testified that he was able to return to the sheriff's office immediately after the shooting despite his injury. Factors (D) and (E) were not established because nothing in Deputy Saltkill's testimony supports an inference that his injury involved protracted or obvious disfigurement, or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.

In accordance with the rationale espoused by our supreme court in Farmer, we must conclude that the State failed to establish that the victim suffered serious bodily injury. Accordingly, the Defendant's conviction for aggravated assault must be modified to a conviction for Class A misdemeanor assault. See Tenn. Code Ann. § 39-13-101.

*B. Resisting Arrest*

Because the Defendant generally challenges the sufficiency of the evidence supporting his convictions, we will also address whether any rational trier of fact could have found the Defendant guilty of resisting arrest beyond a reasonable doubt.

Tennessee Code Annotated section 39-16-602 sets out the elements of resisting arrest. That statute states as follows:

> It is an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer, or anyone acting in a law enforcement officer's presence and at such officer's direction, from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another.

Tenn. Code Ann. § 39-16-602(a). Force is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." Tenn. Code Ann. § 39-11-106(a)(12). Unless the defendant is claiming self-defense against excessive force from officers, see Tennessee Code Annotated section 39-11-611(e), "[w]hether the arrest was or was not supported by probable cause is not determinative as to whether defendant resisted arrest." State v. Edward Iroghuehi Isibor, No. 01C01-9610-CC-00441, 1997 WL 602945, at *3 (Tenn. Crim. App. Sept. 30, 1997), perm. app. denied, (Tenn. Aug. 3, 1998).

Upon our review of the record and in the light most favorable to the State, the evidence supports the jury's finding that the Defendant used force to obstruct Deputy Saltkill from effectuating his arrest. Besides verbally threatening Deputy Saltkill, the Defendant made physical contact with Deputy Saltkill twice, once by shoving him and once by hitting him the chest, before Deputy Saltkill attempted to place him under arrest. Deputy Saltkill testified that the Defendant resisted his official commands that he was under arrest and to get on the ground. Ignoring these commands, the Defendant struck Deputy Saltkill in the eye. Deputy Saltkill had to resort to his taser and, ultimately, his handgun to stop the Defendant's advances. As discussed in the previous section of this opinion, the Defendant's arrest was supported by probable cause. Accordingly, the evidence was sufficient for a jury to find beyond a reasonable doubt that the Defendant was guilty of resisting arrest.

### C. Proof Refuting Claim of Self-Defense

The crux of the Defendant's sufficiency argument is that the State failed to prove that he did not act in self-defense. At the time of the Defendant's trial, Tennessee Code Annotated section 39-11-611 (2006) provided as follows:

(a) A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

(b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly

enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

(c) The threat or use of force against another is not justified if the person consented to the exact force used or attempted by the other individual.

(d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

(1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

(2) The other nevertheless continues or attempts to use unlawful force against the person.

(e) The threat or use of force against another is not justified to resist a halt at a roadblock, arrest, search, or stop and frisk that the person knows is being made by a law enforcement officer, unless:

(1) The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and

(2) The person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary.

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). It is within the prerogative of the jury to reject a claim of self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

Viewed in the light most favorable to the State, the evidence proves that the Defendant invited Deputy Saltkill into his house to discuss the prior encounter with EMS personnel. Shortly after Deputy Saltkill entered, the Defendant began to get belligerent and verbally abusive towards Deputy Saltkill. Deputy Saltkill testified that, after being assaulted by the Defendant twice, he attempted to place the Defendant under arrest. The Defendant

then resisted that arrest, hitting Deputy Saltkill in the eye, and leading to Deputy Saltkill having to shoot the Defendant to stop the continuing assault. In contrast, the Defendant said that Deputy Saltkill was unprovoked when he shot him. Moreover, discussed in detail later in the opinion, the Defendant primarily asserted a claim of innocence, denying that he ever struck Deputy Saltkill. In our view, this case amounted to a classic credibility contest between the Defendant and Deputy Saltkill. The jury obviously accredited the testimony of Deputy Saltkill, as was their prerogative. We will not second-guess the factual determinations made by the jury. Therefore, we conclude that the evidence was sufficient to convict the Defendant of simple assault and resisting arrest.

### III. Evidentiary Rulings

The Defendant makes several challenges to evidentiary rulings of the trial court. First, the Defendant argues that the trial court erroneously admitted photographs of Deputy Saltkill's eye injury. Second, the Defendant submits that the trial court erroneously prevented him from establishing the defense of "criminal trespass."

### A. Photographs

The Defendant contends that the photographs of Deputy Saltkill's eye injury were erroneously admitted. Citing to Tennessee Rule of Evidence 403, the Defendant argues, "The photographs of the victim should not have been admitted into evidence because of the danger of unfair prejudice. The photographs were not needed to show the severity of the victim's injuries and could only inflame the jury." The State responds that the photographs were relevant to show the disfiguring nature of Deputy Saltkill's injury. The State goes on, "[T]he multiple photos taken on different dates were necessary to demonstrate the progression of Deputy Saltkill's injury over time and to corroborate his proclaimed temporary loss of sight."

At the motion for new trial hearing, the Defendant challenged the cumulative nature of the photographs. The State responded that the photographs "were relevant to show the injuries sustained and to corroborate the testimony of the victim." The State continued:

> What we're looking at is several pictures of Officer Saltkill of his eye swollen and the progress of that eye swelling shut to where he was unable to use that eye, to show what it looked like so that the jury could look and see for themselves what the eye looked like, showing extreme pain.

> We had . . . [the Defendant] charged with two counts of aggravated assault. You've got aggravated assault with a deadly weapon. You've got aggravated assault with serious bodily injury. . . . [T]here's several factors that one looks at aggravated assault with serious injury and one of those is extreme

-22-

blunt pain, also the loss and use of, like, your eye or arm or something of that
nature.

The trial court ruled, "[T]here [were] valid reasons to have them admitted . . . . There wasn't an . . . undue amount of them admitted. The [c]ourt felt like . . . the photographs showed the progression of the injuries and not to over extend it. It showed what it needed to as far as the injury and that was sufficient." The trial court noted an additional reason for admission of the photographs:

> I believe Deputy Saltkill had alleged that [the Defendant] had something in his hand, some kind of object. And in order to show that there was a weapon in his possession or control, the photographs -- based on what the jury did, could reasonably believe that [the Defendant] did have an object when he hit Deputy Saltkill . . . based on those photographs.

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. State v. Banks, 564 S.W.2d 947, 949 (Tenn.1978) (citations omitted). Accordingly, "the admissibility of photographs lies with the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005) (quoting Banks, 564 S.W.2d at 949). A relevant photograph is generally admissible, Tennessee Rule of Evidence 402, unless its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. In deciding whether to admit photographs, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt, as well as other evidence that has been introduced during the course of the trial. State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995).

We have inspected the subject photographs and agree with the trial court that their probative value outweighed any undue prejudicial effect. The State had the burden at trial to prove every element of the charged offense, aggravated assault, in particular that the victim suffered some type of bodily injury or that the use of a deadly weapon was involved. See Tenn. Code Ann. § 39-13-102. Though Deputy Saltkill testified at trial about the nature of his injury, his injury was no longer visible. Therefore, the photographs assisted the jury in assessing the nature of the injury the victim suffered and how that injury progressed over time. Moreover, the photographs were not particularly gruesome or graphic. No medical proof was presented about the nature and extent of the victim's injuries. In sum, the admitted

photographs were relevant, and their probative value was not substantially outweighed by any of the criteria set forth in Tennessee Rule of Evidence 403. Accordingly, we conclude that the trial court did not abuse its discretion by admitting the photographs.

## B. "Criminal Trespass" Defense

The Defendant contends that he was denied the right to establish a criminal trespass defense because the trial court did not allow him "to question Deputy Saltkill regarding his trespassing" into his home. During a jury out hearing, the State objected to the defense's asking Deputy Saltkill whether he thought "at any point he was trespassing." The trial court determined that the question asked for a legal conclusion and sustained the objection.

At the motion for new trial hearing, the Defendant explained this issue as he "was denied his argument in pretrial motions to make [a] record regarding trespass or there were no instructions that [D]efendant was allowed to give regarding trespass." The State responded, "[T]rial courts . . . give requested instructions if it is supported by the evidence. And it's just not support[ed] by the evidence. . . . There was no criminal trespass. Again, we argued that. We submitted briefs in that regard to that." The State then addressed the issues presented at the suppression hearing. The trial court ruled, "Defendant's ability to argue criminal trespass, the [c]ourt believes, again, there was no evidence to support such instruction and that's why the [c]ourt ruled that way."

The State initially argues that the issue is waived because the Defendant failed to cite to any authority in his brief establishing that criminal trespass was a defense to the crimes and failed to make appropriate references to the record. See Tenn. R. App. P. 27(a); Tenn. R. Crim. P. 10(b). Again, the State is correct that the issue could be waived, but having a complete record, we choose to address the issue on the merits. The State contends, waiver notwithstanding, that to the extent that the Defendant's theory of trespass was relevant to a defense of property defense, the trial court permitted the Defendant to cross-examine Deputy Saltkill thoroughly about the issue.

At the outset, we note that this court, in explaining the "knock and talk" procedure and the reasoning for it, has quoted with approval the following language:

Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

-24-

Cothran, 115 S.W.3d at 521 (quoting Cormier, 220 F.3d at 1109). There was no proof of any express orders prohibiting trespass upon the Defendant's property. In ruling on the Defendant's motion to suppress, the trial judge accredited Deputy Saltkill's testimony that he entered the house upon invitation.

Couching it in terms of a "criminal trespass" defense, the Defendant was presumably seeking to establish that Deputy Saltkill's entry into his home was unauthorized, therefore, justifying the Defendant's use of force. The Defendant filed proposed jury instructions on September 3, 2008, which was six months before the motion to suppress was denied and over a year and a half before trial occurred. In these proposed jury instructions, the Defendant sought to have the following instructions given to the jury: criminal trespass, Tennessee Pattern Jury Instructions—Criminal 14.05; self-defense, Tennessee Pattern Jury Instructions—Criminal 40.06; and defense of property, Tennessee Pattern Jury Instructions—Criminal 40.08. Defense counsel did reference these instructions at the suppression hearing, "At that point, [Deputy Saltkill] is a trespasser when he does not leave immediately. It's a defense to the trespass statute. That's why we've asked for a trespass instruction that we're going to deal with after the close of proof. He's a trespasser at that point, . . . by not leaving." The proposed instructions were not submitted in the final charge to the jury, and no further objection to their omission is apparent from the record. It appears that, after the Defendant's motion to suppress was denied and following the development of the proof at trial, the Defendant abandoned any "criminal trespass" defense. At trial, the Defendant never argued that he used justifiable force against Deputy Saltkill; as noted above, his central claim was one of innocence, denying he used any force at all against Deputy Saltkill.

Specifically, regarding any limitations on Deputy Saltkill's testimony, Deputy Saltkill was extensively cross-examined about the Defendant's repeated requests for Deputy Saltkill to leave his residence and Deputy Saltkill's failure to do so. The trial court disallowed the question, "did he think at any point he was trespassing," finding that it called for a legal conclusion. The propriety, scope, manner, and control of testimony and other evidence are matters entrusted to the sound discretion of the trial court. State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994); State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)); see also Tenn. R. Evid. 611. "Absent a clear abuse, which has resulted in manifest prejudice to the accused, this court will not interfere with the trial court's exercise of its discretion in matters pertaining to the examination of witnesses." State v. Humphreys, 70 S.W.3d 752, 766 (Tenn. Crim. App. 2001) (citing Coffee v. State, 216 S.W.2d 702, 703 (Tenn. 1948)). Typically, only experts are allowed to give their opinion on an ultimate issue to be decided by the trier of fact. See Tenn. R. Evid. 704. The trial court permitted a thorough cross-examination of Deputy

Saltkill, and we cannot find any abuse of discretion in the trial court's evidentiary ruling on this issue. The Defendant is not entitled to relief on this issue.

### IV. Jury Instructions

The Defendant takes issue with the jury instructions in this case. He contends that a special instruction regarding Deputy Saltkill's phone records should have been issued and that instructions on self-defense and defense of others should have been given to the jury.

### A. Phone Records

The Defendant asserts that the trial court erred in denying his request for a special jury instruction, specifically an instruction "that the State failed to timely obtain the cellular telephone records of the Deputy Dana Saltkill as requested by the Defendant." The Defendant contends that the trial court "should have granted a mistrial or instructed the jury as to the State's duty to preserve the evidence and its failure to do so."[3]

At the February 2009 motion hearing, the trial court granted the Defendant's request for Deputy Saltkill's cellular telephone records from 12:00 a.m. to 5:00 a.m. on September 25, 2006. However, the judicial subpoena incorrectly provided the year as 2007.[4] The State did turn over the phone records it acquired as a result of the subpoena on July 9, 2009. The phone records as given to the defense do not reflect a year, simply a date of Tuesday, September 25, with phone calls during the relevant time frame. Apparently, all parties were unaware of the error until trial. On the third day of trial, defense counsel noted that she discovered the error when she realized that September 25 in 2006 fell on a Monday, not on a Tuesday, as shown in the document. The trial court then issued another subpoena for the correct records that morning. Further attempts were made to get the phone records during the trial, but those attempts were unsuccessful. The phone company responded to the subpoena, "call records are not available for the date and time frame requested," which the trial court interpreted to mean that "they're too old or what-have-you."

The trial court declined to impose any sanctions on the State, finding that there was a "good faith attempt" to obtain the phone records and that prejudice had not been shown. The trial court also ruled, "[i]n the alternative," defense counsel "waived said issue" for

---

[3] This is the first and only time that the Defendant argues that a mistrial should have been granted due to the failure to obtain the information. We decline to address such a cursory allegation made for the first time on appeal.

[4] It appears from the transcript that this was the second subpoena issued for the phone records. Apparently, the first subpoena had the incorrect phone number on it. It was also stated that an order for the phone records was entered on February 19, 2009, that it was signed by the trial judge, that it contained the wrong year, and that the a copy of the order was sent to defense counsel. That order is likewise not included in the record.

failing to bring this error to the court's attention sooner. Defense counsel asked for a special instruction, specifically asking, "are you willing to provide any instruction to the jury that this information was requested but the wrong information was provided," and then later, "I would just like some special instructions that we attempted and were unable to get the cell phone records." The trial court denied the request for a special instruction, stating that "the instruction wouldn't be necessary" because "the response speaks for itself," but it permitted defense counsel to "put on anything else you like about it."

At the motion for new trial hearing, defense counsel argued that the trial court "failed to instruct the jury as to those telephone records or any explications thereof." Defense counsel noted that theory of defense was that "Deputy Saltkill acted improperly by failing to use the 9-1-1 system, which would have been public communication, and his phone records would have . . . showed Deputy Saltkill using his cell phone as another means of communications that he knew wouldn't be recorded." The State responded that the cell phone records were not relevant, reasoning as follows:

> I'm still not sure on what the defense was trying to show. You have an officer who goes out to the residence at the request of EMS. Everyone talks about the poor reception that one gets out there with telephones and they have to use their radio. The radios are recorded. Those radio transmissions from the time that the call came in, there's been a shooting, I'm down, everything that was recorded was placed into evidence[.]

The trial court found the issue to be without merit, concluding that "the cell phone records would not have had any significance with regards" to the "overwhelming" weight of the evidence. The court continued, "[A]ny kind of instruction on that might have misled the jury and confused them on an issue that wasn't relevant to the [c]ourt."

The State, citing to Rule 30 of the Tennessee Rules of Criminal Procedure, responds that the Defendant has waived this claim because he failed to request any special instruction in writing. The State also argues for waiver because the Defendant failed to support his claim "with argument, citation to relevant authorities, or any references to the appellate record." See Tenn. R. App. P. 27; see also Tenn. Ct. Crim. App. R. 10(b).

As far as the brief not conforming with the requirements of Rule 27 of the Tennessee Rules of Appellate Procedure, we agree with the State that the Defendant's argument is cursory. However, the argument portion of the Defendant's brief does contain one citation to authority and one reference to the record. Again, we choose to address the issue on its merits.

The State concedes that the Defendant requested the instruction orally but submits that this effort was insufficient to preserve the issue for appeal. Under the Tennessee Rules of Criminal Procedure, a party requesting special jury instructions "may file written requests that the court instruct the jury on the law as set forth in the requests." Tenn. R. Crim. P. 30(a). "A trial court will not be placed in error where a requested instruction is not in writing." State v. Teresa Sue Skipper, No. E2006-00785-CCA-R3-CD, 2007 WL 187940, at *6 (Tenn. Crim. App. Jan. 25, 2007) (quoting State v. Timothy M. Hodge, No. M2001-03168-CCA-R3-CD, 2002 WL 1732357, at *5 (Tenn. Crim. App., July 26, 2002)); see also State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982). Because Rule 30 of the Tennessee Rules of Criminal Procedure "envisions that such requests be made in writing," oral requests for instructions are not sufficient for an appellate court to find that the trial court's instructions were improper. Mackey, 638 S.W.2d at 836.

The requirement of a written request is not applicable when the issue concerns fundamental defenses. See Morrison v. State, 371 S.W.2d 441 (1963). However, the failure to comply with a discovery request is not such a defense.

A written request was never submitted to the trial court at the conclusion of trial, nor has the Defendant set forth a proposed jury instruction in his brief to this court. It is also unclear from our review of the record of the trial and the hearing on the motion for new trial what the proposed instruction would have been. Because a trial court will not be placed in error when a requested special instruction was not presented in writing, and no inaccuracy exists in the charge given by the trial court, the Defendant is not entitled to relief on this issue.

*B. Self-Defense*

The Defendant submits that the trial court should have included an instruction on self-defense and defense of others in its charge to the jury. See Tenn. Code Ann. §§ 39-11-611 (self-defense), -612 (defense of a third person) (2006). The Defendant acknowledges that the issue was not raised in the motion for new trial but argues for plain error review. Specifically, he contends that he did not waive the instruction for tactical reasons, stating, "[T]he [c]ourt's refusal to allow defense counsel to ask questions regarding the officer's entry into the home without consent hindered counsel[']s ability to present the defense." He further submits that the proof supported such an instruction. The State takes the initial position that the Defendant has waived review of this issue by failing to include it in his motion for new trial. See Tenn. R. App. P. 3(e) (An issue predicated on a trial court's refusal to give a requested instruction is waived unless the issue was first specifically raised in a motion for new trial.). Addressing the factors of plain error review, the State contends that plain error review is not warranted because the proof did not support such an instruction and because the Defendant failed to demonstrate that waiver of the issue was not tactical.

Initially, we note that, nowhere is it apparent from the record that the Defendant ever requested an instruction on defense of others. Moreover, although a self-defense instruction was requested over a year prior to trial, no objection was lodged to its omission from the final charge to the jury, and the issue was not raised in the Defendant's motion for new trial. As discussed above, we review the trial court's refusal to instruct the jury on self-defense and defense of others for plain error.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In determining whether plain error review is appropriate, the following factors must be established:

> (a) The record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) (citing State v. Bledsoe, 226 S.W .3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

A trial court has the duty to "give a complete charge of the law applicable to the facts of the case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial . . . . " State v. Anderson, 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). In deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001).

Our supreme court has held that "a trial court judge's failure to give a jury charge on matters characterized as 'fundamental' may be found to be error requiring reversal" even if the defendant did not request the omitted instructions. State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994). In Tennessee, the law of self-defense is fundamental to a case when the evidence fairly raises it as an issue. See Tenn. Code Ann. § 39-11-203(c); see also Myers v. State, 206 S.W.2d 30, 32 (Tenn. 1947) (holding that a defendant is entitled to an

affirmative instruction on self-defense if raised by the evidence). The defendant has the burden of introducing admissible evidence that a defense is applicable. Tenn. Code Ann. § 39-11-203(c), Sentencing Comm'n Cmts. Thus, this court may find error only if a jury charge "fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994).

Based upon our analysis above, we conclude that the Defendant failed to present evidence that fairly raised an issue as to whether he acted in defense of either self or others when he hit the victim. At trial, the Defendant said that Deputy Saltkill was unprovoked when he shot him, never arguing that he used justifiable force against Deputy Saltkill. Once again, as noted above, his central claim was one of innocence. Thus, there was no basis for the trial court to conclude that the evidence fairly raised an issue as to whether the Defendant acted in defense of either self or others. The trial court did not breach any clear and unequivocal rule of law, which a finding of plain error requires. See Adkisson, 899 S.W.2d at 641-42.

Importantly, this appears to be yet another attempt to relitigate matters which were addressed at the motion to suppress hearing. Just as with the defense of "criminal trespass," it appears that, after the Defendant's motion to suppress was denied and following the development of the proof at trial, the Defendant abandoned any claim of self-defense or defense of others. We agree with the State that the Defendant has failed to demonstrate that he did not waive issuance of the instructions for tactical reasons. The failure to instruct on self-defense or defense of others does not amount to plain error.

## CONCLUSION

In sum, the evidence is insufficient to support the Defendant's conviction for aggravated assault because the State failed to establish that the victim suffered serious bodily injury. Consequently, the Defendant's conviction for aggravated assault is modified to a conviction for Class A misdemeanor assault. The evidence was sufficient to support the judgment for resisting arrest, and that judgment is affirmed. The case is remanded for resentencing and further proceedings consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE

-30-