**STATE of Tennessee**

v.

**William Glenn TALLEY.**

Supreme Court of Tennessee,
at Nashville.

Feb. 11, 2010 Session.

March 19, 2010.

724

David Louis Raybin, Nashville, Tennessee, for the appellant, William Glenn Talley.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Mark A. Fulks, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

GARY R. WADE, delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

After receiving information about illegal drug sales at the condominium residence of the defendant, detectives from the police department, which, among others, had been previously provided with the access code to the locked front entrance of the building, were permitted entry into the commonly owned interior hallway by an unknown individual. The detectives knocked at the defendant's unit, received consent to search from the girlfriend of the defendant, and observed what appeared to be drugs and drug paraphernalia. After

search warrants were issued, first for the defendant's residence and then for his business, the police found drugs and child pornography; further, the defendant, upon questioning, made incriminatory statements. A grand jury indicted the defendant on six separate charges. The trial court denied a motion to suppress the evidence acquired by the police and then granted the defendant an interlocutory appeal. The Court of Criminal Appeals affirmed. We granted an application for permission to appeal in order to determine whether the defendant had a legitimate expectation of privacy in the locked, commonly shared interior hallway of the condominium. Because the totality of the circumstances establish that the defendant could not reasonably expect privacy in the hallway leading to his residential unit, the order denying the motion to suppress is affirmed and the cause is remanded for trial.

### Factual and Procedural History

During the summer of 2005, William Glenn Talley (the "Defendant") resided in a condominium unit he owned on the second floor of Hedrick Place, located at 116 31st Avenue North in Nashville. Including the Defendant, there were twenty-one owners of units within the condominium building. Ownership of a unit included a parking space and an equal share in the common areas, such as the interior hallways, the stairway, and yard. The property did not display "no trespassing" signs. The front door entrance, accessible from the public sidewalk, was locked at all times, requiring visitors without an access code to make contact with a resident by use of an electronic keypad and the telephone system in order to gain entry. The

unit resident permitting entry either provided the visitor with an access code via the telephone system or simply opened the front door manually. Any resident or guest could admit anyone, including the police, to the common areas of the building. Those entering the front door had access to all of the common areas. The police department, the fire department, the postal service, United Parcel Service, FedEx, facility cleaners, vendors, and perhaps others were provided with an access code to the front entrance. The dispatcher at the police department maintained the code on file so that officers could call in for access at any time.

On or about August 11, 2005, an individual who expressed the desire to remain anonymous reported to the Metropolitan Nashville Police Department through "244–DOPE–LINE" that the Defendant was selling illegal drugs at his condominium unit.[1] Five days later, at approximately 7:45 p.m., Detective Joseph Simonik, accompanied by Detectives Fox, Osborne, Stokes, and Gonzales, arrived at the condominium building and contacted the dispatcher in order to obtain the access code for the front door. The detectives, who had purposefully chosen not to alert the Defendant of their presence before they reached his unit, wore "raid jackets" clearly marked with a police patch and badge. While the officers waited for the dispatcher to provide the code, a casually dressed man, who was departing the premises, opened the door, greeted the officers, and allowed them entry. Detectives Simonik, Fox, and Osborne proceeded to the Defendant's second floor unit, and Detectives Stokes and Gonzales waited in the hallway. Within thirty to forty seconds after entering the building, Detective Simonik

---

1. Detective Simonik acknowledged that the caller actually provided his or her identity but had requested confidentiality.

knocked at the door of the Defendant's unit. Kimberly Knight answered and informed the officers that the Defendant was not present. Detective Simonik asked permission to enter the unit in order to talk further, and Ms. Knight, who told the officers that she had shared the residence with the Defendant for approximately three weeks, agreed. As the detectives walked into the living room, they observed, in plain view, a glass smoking pipe and a knife containing white residue.

Shane Cathey, Ms. Knight's teenage brother, had been staying at the condominium and was present when the detectives arrived. When questioned by Detective Fox, Cathey admitted that he had possession of Xanax, which had been supplied by the Defendant. Drugs were in his pocket. Ms. Knight called the Defendant on her mobile phone and allowed Detective Simonik to speak directly to him. After explaining the purpose of the investigation, Detective Simonik asked the Defendant, a licensed pharmacist, to return to the condominium. When the Defendant arrived shortly thereafter, the detective asked for permission to search. At that point, the Defendant asked for the opportunity to speak to an attorney, made several telephone calls, and then walked upstairs in hopes of finding an attorney who resided in one of the other condominium units. Ultimately, he declined consent to search. Detective Simonik left to acquire a search warrant, and the other officers secured the area until his return. Meanwhile, the De-

fendant was informed that he was free to leave the premises.

After a search warrant was obtained, the officers conducted a search of the unit at approximately 10:15 p.m. They discovered more illegal drugs, drug paraphernalia, pornographic images of children, and three pornographic compact discs.[2] When Ms. Knight informed Detective Simonik that the Defendant had other drugs and a gun at his place of business, the officers applied for a search warrant at that location. The second warrant was issued at 2:59 a.m. on the following day. Two hours later, the officers found more illegal drugs, a gun, and a large number of pornographic images of children at the Defendant's place of business. When arrested, the Defendant admitted to having used cocaine since the prior September and acknowledged that he had provided illegal drugs to some of his friends in exchange for money, explaining that he did not consider this to be "selling." He also asserted that he had downloaded the images the detectives found on his computer only out of curiosity.

Based upon the results of the investigation, the Defendant was indicted by a grand jury on six counts: (1) exploitation of a minor by possessing more than fifty images of child pornography; (2) sexual exploitation of a minor by possessing more than one-hundred images of child pornography; (3) possession of dihydrocodeinone with intent to sell or deliver; (4) posses-

---

2. In the course of their investigation at the condominium, the police seized the following items: a folding knife with white residue; a white cup with residue; a glass vial with copper mesh; a glass vial with residue; a glass pipe with dark residue; three straws with white residue; four plastic bags with white residue; a mirror with white residue; another marijuana pipe; two sets of digital scales; a bag containing plastic baggies; a plastic cocaine sniffer; a black and silver pipe; a set of glass pipes with residue; a metal grinder for marijuana; two plastic bags of marijuana; two bags of Xanax; a pill bottle of Hydrocodone; various pill bottles containing 1,928 Xanax pills, 115 Mersyndol pills, 1,198 Lomotil pills, and nine Klonopin pills; a Dell notebook computer containing images of child pornography; three pornographic compact discs; and several other compact discs. Child pornography was also found in the Defendant's briefcase.

sion of alprazolam with intent to sell or deliver; (5) possession of clonazepan with intent to sell or deliver; and (6) possession of diphenoxylate with intent to sell or deliver. *See* Tenn.Code Ann. §§ 39–17–1003 & –417 (2003).

The Defendant filed a motion to suppress all of the incriminating evidence acquired by the police, contending that the condominium search was illegal and arguing that the search of the business and any of his incriminatory statements were unattenuated products of the wrongful search. Charles Reasor, Jr., an attorney and homeowners association board member who owned a unit at Hedrick Place, testified for the Defendant at the hearing on the motion. When asked whether he considered the access code given to various nonresidents an "emergency code" for the police, he answered yes. When asked whether the police had been allowed "free rei[ ]n" into the building absent an emergency, Reasor answered, "No." On further questioning, however, he conceded that the police "could have access, if they wanted to know the code" and that they had been there in non-emergency situations, such as for the preparation of an automobile accident report and a burglary investigation. Further, Reasor acknowledged that the code had "just been registered with the police department, just like it has with the postal service," and the use of the code by the police was "at their discretion."

After concluding from this testimony that the Defendant had a reasonable expectation of privacy in the hallway leading to his condominium unit door, an area "protected from warrantless entry," and the officers had gained entry in order to conduct a "knock and talk," *see United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir.2000), the trial court observed that the motion to suppress would have been granted absent the intervening consent to

search by Kimberly Knight. *See State v. Cothran*, 115 S.W.3d 513, 521 (Tenn.Crim. App.2003) (upholding a "knock and talk" as a proper investigatory technique in a consensual encounter). The trial court refused to rule out the evidence after finding that the consent by Ms. Knight, as a lawful occupant of the unit, was not causally linked to the illegal intrusion. In the interlocutory appeal, the Court of Criminal Appeals affirmed, but on different grounds, concluding that the Defendant had no reasonable expectation to privacy in the common areas of the condominium complex. *State v. Talley*, No. M2007–01905–CCA–R9–CD, 2009 WL 1910949, at *6 (Tenn.Crim.App. July 1, 2009). In anticipation of this Court's further review, the Court of Criminal Appeals alternatively ruled that had the Defendant reasonably expected privacy in the hallway and had the initial entry, therefore, been unlawful, the State failed to establish that the consent by Ms. Knight was sufficiently removed from the illegality so as to permit the admission of the evidence acquired. *Id.* at *7.

This Court granted the application for permission to appeal in order to address whether the Defendant had a reasonable expectation of privacy in the commonly owned hallway of the condominium complex. If not, the motion to suppress was properly denied, and the alternative theories advanced by the State would not warrant consideration.

### Standard of Review

The standard of review applicable to suppression issues is well-established. When the trial court makes findings of fact at the conclusion of a suppression hearing, the findings are binding upon this Court unless the evidence in the record preponderates against them. *State v. Odom*, 928

S.W.2d 18, 23 (Tenn.1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* Our review of a trial court's application of law to the facts, however, is de novo, with no presumption of correctness. *See State v. Walton,* 41 S.W.3d 75, 81 (Tenn.2001) (citing *State v. Crutcher,* 989 S.W.2d 295, 299 (Tenn.1999); *State v. Yeargan,* 958 S.W.2d 626, 629 (Tenn.1997)).

## Applicable Law

■■■ Both the federal and state constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures...."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)); *see also State v. Bridges,* 963 S.W.2d 487, 490 (Tenn.1997) ("[A] warrantless search or seizure is presumed unreasonable."). The Fourth Amendment and article I, section 7 of our constitution protect the curtilage, which is defined as any area adjacent to a residence in which an individual can reasonably expect privacy. *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Intrusion within the curtilage, as an area of expected privacy, may be unlawful. *State v. Prier,* 725 S.W.2d 667, 671 (Tenn.1987). Exceptions to the warrant requirement include searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search. *State v. Cox,* 171 S.W.3d 174, 179 (Tenn.2005). Reasonableness is the "touchstone of the Fourth Amendment." *Florida v. Jimeno,* 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing *Katz,* 389 U.S. at 360, 88 S.Ct. 507); *see also Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *State v. Scarborough,* 201 S.W.3d 607, 616 (Tenn.2006). These constitutional protections are designed to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Keith,* 978 S.W.2d 861, 865 (Tenn.1998) (quoting *Camara v. Mun. Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)).

■■■ This Court has previously held that our state constitution offers more protection than the corresponding provisions of the Fourth Amendment. *See, e.g., State v. Jacumin,* 778 S.W.2d 430, 436 (Tenn.1989); *State v. Lakin,* 588 S.W.2d 544, 549 (Tenn. 1979). As under the federal constitution, evidence obtained as a result of a warrantless search or seizure "is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined

exceptions to the warrant requirement." *Yeargan*, 958 S.W.2d at 629. The state, of course, "bears the burden of proof when a search or seizure is conducted without a warrant." *State v. Berrios*, 235 S.W.3d 99, 105 (Tenn.2007) (citing *Yeargan*, 958 S.W.2d at 629).

Neither the Fourth Amendment nor article 1, section 7 of our constitution precludes governmental intrusion absent the reasonable expectation of privacy. *See Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *State v. Munn*, 56 S.W.3d 486, 494 (Tenn.2001). In consequence, "an investigation by governmental authorities which is not a search as defined by the Supreme Court may be conducted without probable cause, reasonable suspicion or a search warrant." *State v. Bell*, 832 S.W.2d 583, 589–90 (Tenn.Crim.App.1991). The "rights assured by the Fourth Amendment are personal rights, and ... they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). The focus of the inquiry is "on the extent of a particular defendant's rights under the [constitution], rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

In the determination of whether a search or seizure meets constitutional standards, the first consideration, therefore, is whether the accused has a reasonable expectation of privacy. *See Katz*, 389 U.S. at 360, 88 S.Ct. 507 (Harlan, J., concurring). In *Katz*, a two-prong test was established: "(1) whether the individual had an actual, subjective expectation of privacy and (2) whether society is willing to view the individual's subjective expecta-tion of privacy as reasonable and justifiable under the circumstances." *Munn*, 56 S.W.3d at 494 (citing *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)). A defendant has the initial burden of establishing a legitimate expectation of privacy, and the failure to do so is dispositive in favor of the state. *E.g., State v. Oody*, 823 S.W.2d 554, 560 (Tenn.Crim.App.1991).

## Analysis

In this instance, the Defendant argues that this Court should adopt a bright-line rule precluding the police from entering the locked common area of a privately owned condominium building, apartment complex, or similar multi-unit dwelling, and, therefore, overturn the ruling of the Court of Criminal Appeals. In response, the State asserts that the Defendant had no reasonable expectation of privacy in the interior hallways of the condominium complex, and, further, that the police had authority to enter based upon consent not only by virtue of their having been provided the entry code by the condominium ownership but also by permission of the individual who had held open the front entrance door for the detectives participating in the investigation.

Our decision in *State v. Ross*, 49 S.W.3d 833 (Tenn.2001), addresses the expectation of privacy issue in the context of the Fourth Amendment and article 1, section 7 of the Tennessee Constitution. In that case, this Court considered a challenge by the occupants of a motel to a warrantless search by the police and discussed at length the state's contention that Ross, who, in response to questioning by the authorities at the scene, had disclaimed any interest in the motel unit, had no reasonable expectation of privacy. After observing that the federal and state constitutions afforded privacy protections to the

resident of a hotel or motel room, this Court recognized a totality of the circumstances test, applying the seven factors developed in *United States v. Haydel,* 649 F.2d 1152 (5th Cir.1981), but also carved out an exception, holding that when a defendant disclaims any interest in the object of a governmental search, the expectation of privacy is lost. *Ross,* 49 S.W.3d at 840–42. Absent the disclaimer exception, this Court approved of the following factors:

(1) [whether the defendant owns the property seized]; (2) whether the defendant has a possessory interest in the thing seized; (3) whether the defendant has a possessory interest in the place searched; (4) whether he has the right to exclude others from that place; (5) whether he has exhibited a subjective expectation that the place would remain free from governmental invasion; (6) whether he took normal precautions to maintain his privacy; and (7) whether he was legitimately on the premises.

*Id.* at 841 (quoting *Haydel,* 649 F.2d at 1154–55). The Court of Criminal Appeals first used this test in *State v. Turnbill,* 640 S.W.2d 40, 46 (Tenn.Crim.App.1982), and has often resorted to the use of these factors when considering the legitimacy of a privacy claim. *See, e.g., Oody,* 823 S.W.2d at 560; *State v. Woods,* 806 S.W.2d 205, 208 (Tenn.Crim.App.1990).

■ In this instance, the Defendant, properly asserting that a condominium complex is analogous to an apartment building, specifically asks this court to follow the ruling in *United States v. Carriger,* 541 F.2d 545 (6th Cir.1976), a decision in which the United States Court of Appeals for the Sixth Circuit considered "whether a tenant in an apartment building has a reasonable expectation of privacy in the common areas ... not open to the general public." *Id.* at 549. In *Carriger,* a federal agent gained entry to a locked interior corridor of an apartment building by preventing the door from closing as several workers exited the premises. *Id.* at 548. The Sixth Circuit fashioned a rule that when "an officer enters a locked [apartment] building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed." *Id.* at 552. The rationale for the decision was that a tenant in a locked apartment building, much like the circumstances here involving a locked but shared condominium hallway, has an expectation that only other building residents or their invited guests would have access to the common areas. *Id.* at 551; *see also United States v. Heath,* 259 F.3d 522, 534 (6th Cir.2001) (determining that evidence seized in the defendant's apartment unit must be suppressed, even though a co-resident consented to the search, because of the expectation of privacy in a hallway with a locked entrance).[3] Illinois, Louisiana, Michigan, and perhaps other state courts appear to concur in the rule established in the Sixth Circuit. *See, e.g., People v. Trull,* 64 Ill.App.3d 385, 20 Ill.Dec. 960, 380 N.E.2d 1169, 1173 (1978); *State v. Di Bartolo,* 276 So.2d 291, 294 (La.1973); *People v. Killebrew,* 76 Mich. App. 215, 256 N.W.2d 581, 583 (1977). Our research, however, establishes that the Sixth Circuit represents the minority view among the federal circuit courts of appeal that have addressed the issue.

■ In *United States v. Eisler,* 567 F.2d 814 (8th Cir.1977), the Eighth Circuit,

---

**3.** In contrast, a walkway leading from a public sidewalk or street to the front door of the residence "represents an implied invitation to the general public to use the walkway for purpose of pursuing legitimate social or business interests" and is not protected by the Fourth Amendment or article 1, section 7 of the Tennessee Constitution. *State v. Harris,* 919 S.W.2d 619, 623–24 (Tenn.Crim.App. 1995).

only a year after the *Carriger* decision, concluded that the locks on the doors at the entrances of an apartment building were designed to provide security for the occupants, not for the common hallways.[4] Because the hallways were commonly accessible by residents, their guests, and other individuals having a legitimate reason to be on the premises, the Eighth Circuit panel concluded that the tenant in the apartment building had no reasonable expectation of privacy in that area. *Id.* at 816. Our review of the more recent cases confirms that among the federal courts of appeal, the Sixth Circuit stands alone in recognizing a reasonable expectation of privacy in the common areas of a locked apartment building. To illustrate, in *United States v. Holland*, 755 F.2d 253 (2d Cir.1985), the Second Circuit followed the rule established in *Eisler*. Thereafter, the Seventh Circuit, *United States v. Concepcion*, 942 F.2d 1170, 1171–72 (7th Cir. 1991), and the Ninth Circuit, *United States v. Nohara*, 3 F.3d 1239, 1241–42 (9th Cir. 1993), followed suit. A number of other states have since adopted what now appears to be the majority position among the states which have considered the question. *See, e.g., People v. Lyles*, 332 Ill. App.3d 1, 265 Ill.Dec. 591, 772 N.E.2d 962, 966 (2002); *Commonwealth v. Dora*, 57 Mass.App.Ct. 141, 781 N.E.2d 62, 67 (2003); *State v. Davis*, 711 N.W.2d 841, 845 (Minn.Ct.App.2006); *Commonwealth v. Reed*, 851 A.2d 958, 962 (Pa.Super.Ct.2004).

In the case before us, Judge Norma M. Ogle, writing for the Court of Criminal Appeals, observed that access to the hallways of a condominium complex or an apartment building by those other than tenants would not necessarily negate a reasonable expectation of privacy, thereby rejecting the Sixth Circuit bright-line rule that a resident always has a reasonable expectation of privacy in a secured common area:

> The determination as to whether a tenant has a reasonable expectation in the common areas of a locked apartment building is a fact-driven issue. In the instant case, [condominium board member] Charles Reasor testified that owners could give their guests the access code to get into the building and that various nonresidents such as delivery and cleaning people used the code. *See State v. Breuer*, 577 N.W.2d 41, 46–47 (Iowa 1998) (noting as one factor in its conclusion that the defendant had a reasonable expectation of privacy in the stairway of his locked apartment building was that guests usually waited at building door after ringing doorbell). Furthermore, twenty-one condominiums were in the building. Given the numerous third parties that had unescorted access to the building's common areas, we conclude that the [defendant] in this case did not have an actual, subjective expectation of privacy in those areas.

*Talley*, 2009 WL 1910949, at *6 (citation omitted).

The trial court specifically found that the police dispatcher had the code number required for entry, but that while the detectives were waiting for the information to be passed along by the dispatcher, "a man leaving the condominium held the door open for the detectives to enter."

---

4. As a general rule, unlocked or unsecured common areas of apartment buildings do not qualify for any reasonable expectation of privacy. *State v. Taylor*, 763 S.W.2d 756, 760 (Tenn.Crim.App.1988); *see also United States v. Luschen*, 614 F.2d 1164, 1173 (8th Cir. 1980). If the hallway of a multi-unit dwelling is readily accessible to the general public, police may enter. *State v. Crider*, 341 A.2d 1, 4 (Me.1975); *see also United States v. Acosta*, 965 F.2d 1248, 1253–54 (3d Cir.1992).

Because the individual who opened the door for the officers to enter was not identified, the trial court refused to classify the entry as properly authorized by a resident.[5]

In our view, the State's failure to identify who opened the door is not dispositive on the expectation of privacy issue, but would qualify as a fact to be taken into consideration under the analysis established in *Ross*. The decision in *United States v. Miravalles*, 280 F.3d 1328, 1331–32 (11th Cir.2002), is instructive. The Eleventh Circuit Court of Appeals, while addressing the expectation of privacy question in the common areas of an apartment building, also chose to deviate from the Sixth Circuit rule, adopting instead the majority position within the federal circuit courts of appeal while considering a variety of factors in its analysis:

> Five of the six circuits that have decided the issue have concluded that tenants do not have a reasonable expectation of privacy in the common areas of their apartment building. Of those five decisions, four necessarily suggest that it does not matter whether the door to the apartment building is locked or unlocked at

the time law enforcement officers arrive, because in each of those cases the door was locked.

 . . . .

The five circuits holding that there is no reasonable expectation of privacy in the common areas of an apartment building reason that tenants have little control over those areas, which are available for the use of other tenants, friends and visitors of other tenants, the landlord, delivery people, repair workers, sales people, postal carriers and the like. *The reasonableness of a tenant's privacy expectation in the common areas of a multi-unit apartment building stands in contrast to that of a homeowner regarding the home and its surrounding area, over which the homeowner exercises greater control. The more units in the apartment building, the larger the number of tenants and visitors, workers, delivery people, and others who will have regular access to the common areas, and the less reasonable any expectation of privacy. Whether the door to the building is locked is another relevant consideration.*

5. The trial court implicitly ruled that the consent by Ms. Knight was sufficiently attenuated from the illegal entry at the front door of the condominium building. In order to determine whether the causal connection between an unlawful search and seizure and a consent to search has been broken, a court should consider the following three factors set forth by the United States Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975): "1) the temporal proximity of the illegal seizure and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." *State v. Garcia*, 123 S.W.3d 335, 346 (Tenn.2003). The question of attenuation is subject to de novo review. *State v. Ford*, 30 S.W.3d 378, 380 (Tenn.Crim.App.2000). The state carries the initial burden of establishing sufficient attenuation. *Brown*, 422 U.S. at 604, 95 S.Ct. 2254.

Because only thirty seconds to two minutes passed between the detectives' entry through the front door of the building and the knock at the Defendant's second floor unit, the first factor was held by the Court of Criminal Appeals to have weighed against attenuation. Because there were no compelling intervening circumstances, the second factor weighed in favor of the Defendant. Because the officer initially described the informant as anonymous and later revealed that he knew the identity, the Defendant was not present, and Ms. Knight was not a suspect, the third factor was also deemed favorable for the Defendant. Thus, had the intrusion in the first instance been unlawful, the Court of Criminal Appeals would have found no basis for the application of the doctrine of attenuation. *Talley*, 2009 WL 1910949, at *7.

*Id.* at 1331–32 (emphasis added) (citations omitted).

Having considered our 2001 holding in *Ross* and the developments in the federal courts of appeal since the Sixth Circuit decision in *Carriger,* we reject any bright-line rule and maintain our view that the totality of the circumstances test is best-suited for determining the reasonableness of an expectation of privacy. Application of these factors to the circumstances existing at Hedrick Place favors the State. Although the Defendant had a 1/21st ownership interest in the common areas of the building and the front entrance was locked at all times, each of the residents, according to Reasor, had the right to permit entry without restrictions. Neither the Defendant nor any other resident could unilaterally exclude others rightfully within the hallway. While the Defendant was entitled to privacy in his condominium unit, there is no evidence that he exhibited a subjective expectation that the common areas, and particularly the hallways, would be free from intermittent access by the police. To the contrary, the record establishes that the condominium residents had collectively provided not only the police department but also several others with the entry code for use in the ordinary course of their duties.[6] Police access was "discretionary" and not always limited to emergencies. Moreover, there is no evidence that the Defendant had taken any precautions to maintain his privacy in the common areas of the building. The totality of these circumstances establish that the Defendant could not have had a reasonable expectation of privacy in the interior hallway between the condominium entrance and the door to his particular unit.

▮▮▮▮▮ There being no illegality in the initial entry into the condominium building, it follows that the consent to enter the unit given by the Defendant's girlfriend, Ms. Knight, who shared his residence, is valid. In *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court held that consent to a warrantless search by one who possesses common authority over the premises or effect is valid as against an absent, non-consenting person with whom that authority is shared. Common authority is defined as the "mutual use of the property by persons generally having joint access or control ... so that it is reasonable to recognize that any of the co-habitants has the right to permit [an] inspection ... and that the others have assumed the risk...." *Id.* at 171, n. 7; *see also State v. Bartram,* 925 S.W.2d 227, 231 (Tenn.1996) (holding that even an "angry wife" may consent to search as one with "common authority" over premises, and that such consent is valid against the opposing wishes of an absent, non-consenting husband with whom that authority is shared). Further, neither the search warrants nor the incriminatory statements by the Defendant are tainted by the conduct of the police; therefore, the "fruit of the poisonous tree doctrine" does not apply. *See Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### Conclusion

Because the Defendant did not have a reasonable expectation of privacy in the

---

**6.** The Court of Criminal Appeals considered the number of residences in the condominium as a factor in the analysis of expectation of privacy, suggesting that the greater the number of residents, the lesser the expectation of privacy. In *United States v. King,* 227 F.3d 732, 749–50 (6th Cir.2000), the Sixth Circuit

Court of Appeals recognized that principle, holding that the nature of the living arrangements in a duplex afforded a greater expectation of privacy in common areas than that which a resident of a multi-unit apartment building might enjoy.

commonly shared, interior hallway of a condominium complex that ran from the front entrance to his unit's doorway, the motion to suppress was properly denied. The judgment of the Court of Criminal Appeals, which upheld the trial court's refusal to grant relief, is affirmed. Costs are assessed against the Defendant, William Glenn Talley, for which execution may issue if necessary.