# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
September 9, 2014 Session

## STATE OF TENNESSEE v. JONATHAN WOMACK

**Appeal from the Circuit Court for Coffee County**
**No. 39,141F    Vanessa A. Jackson, Judge**

**No. M2013-02743-CCA-R3-CD - Filed December 5, 2014**

The Defendant, Jonathan Womack, pled guilty to possession of less than .5 grams of methamphetamine with intent to sell or deliver. He agreed to a sentence of six years, all of which was suspended after sixty days' incarceration. As part of the plea agreement, the Defendant reserved a certified question of law challenging the trial court's denial of his motion to suppress the evidence obtained during the warrantless search of his residence, which was conducted following a "knock and talk" encounter and claimed exigent circumstances. After a thorough review of the applicable law, we conclude that the officers encroached upon the curtilage of the Defendant's home to conduct the "knock and talk" at the backdoor of his residence and that they, thereafter, created any exigent circumstances. However, we further conclude that the evidence found on the Defendant's person was obtained pursuant to an independent source—a valid warrant for his arrest. Therefore, the order of the trial court denying the motion to suppress is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Thompson J. Kirkpatrick, Manchester, Tennessee (on appeal); and Bethel Campbell Smoot, Jr., District Public Defender, and Laura D. Pickering, Assistant Public Defender (at guilty plea and motion to suppress), Tullahoma, Tennessee, for the appellant, Jonathan Womack.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Charles Michael Layne, District Attorney General; and Jason M. Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

On March 26, 2011, at 2:36 a.m., Officers James Sherrill and Dale Robertson with the Coffee County Sheriff's Department followed a tip about an active methamphetamine laboratory and went to the Defendant's residence located at 3084 K Parker Road to engage in a "knock and talk" encounter. As a result of this encounter, an indictment was issued by the Coffee County grand jury against the Defendant and his co-defendant, Joey Lynn Mooneyham, on November 28, 2011. Thereafter, a superseding indictment was issued, charging the Defendant[1] with simple possession of marijuana, a Class A misdemeanor; possession of drug paraphernalia, a Class A misdemeanor; and possession of .5 grams or more of methamphetamine with intent to sell or deliver, a Class B felony. See Tenn. Code Ann. §§ 39-17-417, -418, -425. The Defendant filed a motion to suppress all evidence obtained as a result of the search of his home, arguing that "the deputies['] unlawful entry into the curtilage including the backyard, onto the [D]efendant's back porch and into the manufactured home and the subsequent detention of the occupants, taints the evidence found both prior to the search warrant and pursuant to the search warrant."[2]

During a hearing on the motion, Officer Sherrill first testified regarding his credentials with methamphetamine manufacture, working over 300 cases. He then stated that he first encountered the Defendant in April 2010 when officers executed a search warrant, involving the same two defendants, at the Defendant's residence looking for a methamphetamine laboratory. Officer Sherrill could not remember if someone was outside the manufactured home when they arrived or if they knocked on the door first. However, he was clear that they entered through the "laundry-room door" on the back side of the residence. The officers did not find "enough to charge" the defendants on that occasion. Officer Sherrill recalled "one other time" that they were at the residence, but he could not remember the reason for the visit.

On March 26, 2011, Officer Sherrill received a call form Manchester Police Department Officer Devon DeFord. Officer DeFord informed Officer Sherrill that he had just made a traffic stop of a female individual who had information about methamphetamine in her possession and said that he wanted Officer Sherrill to assist him with interviewing her at the police department. When Officer Sherrill spoke with this female, "she advised that she had been to the address there on K Parker Road and specifically named [both defendants] as being there in the residence and said that [the Defendant] had been up for about three days

---

[1] There was an additional count of the superseding indictment charging promotion of methamphetamine manufacture, see Tennessee Code Annotated section 39-17-433; however, this count only named the co-defendant.

[2] The motion also raised an issue with the sufficiency of the property description in the search warrant. However, that issue was not included in the certified question and is, therefore, not the subject of this appeal. We will only recount the facts relevant to the suppression issue presented.

cooking meth and that he was bragging about it." This female further advised that she had just left the residence and opined, "If you go out there right now, I guarantee you you will find something." So Officers Sherrill and Robertson, accompanied by another officer, proceeded to the Defendant's residence.

When Officer Sherrill arrived at 2:36 a.m., "all the cars were parked either to the side or to the very back of the residence." He opined, "You can tell that's the way they go in when they go." Furthermore, Officer Sherrill stated that there were no front steps to the residence on this occasion, and according to Officer Sherrill, he had never observed front steps to the residence at any time. Officer Sherrill went to the back door, and Officer Robertson "stayed to the front." As Officer Sherrill "was at the back walking around to go up the steps to go to the porch," he pointed his flashlight and saw "in plain view a Coleman fuel can and a Claritin-D box sitting on top of a burn pile . . . ." Officer Sherrill knew, given his experience and training, that Claritin-D contains pseudoephedrine, a precursor to methamphetamine manufacture. He walked over to the burn pile to verify that it was in fact a Claritin-D box, but he did not "dig through the burn pile."

Officer Sherrill stated that he then proceeded to the back door, which was "wide open," and knocked; however, no one came to the door. He could smell the odor of methamphetamine "coming from out of the house from that open door." He noticed the smell as soon as he "walked up to the porch . . . ." According to Officer Sherrill, a light was on in the kitchen, which was just to the left of the door, so he looked through the kitchen window and saw three individuals sitting at a table. Officer Sherrill then "beamed" his flashlight at the individuals, who "jumped up and just took off running." Given his experience and training, Officer Sherrill believed the individuals intended to dispose of the drugs by flushing them down the toilet. Officer Sherrill, joined by Officer Robertson who had since come to the back of the residence to assist, then went inside to secure the residence's occupants. According to Officer Sherrill, the defendants and two other individuals were present. The officers, following their entry, observed some methamphetamine on a plate in the living room "right beside them." The officers secured the individuals and seated them at the kitchen table.

The Defendant would not consent to a search, despite the fact that his co-defendant did, so Officer Sherrill went to secure a search warrant. While Officer Sherrill was en route to the jail, "officers there" determined that the Defendant had "worthless-check warrants" for his arrest.[3] The Defendant was then placed under arrest, and upon a pat-down search,

---

[3] Four worthless check warrants were entered as exhibits to the hearing.

methamphetamine was found on his person.[4] Additionally, after procurement of a search warrant, the defendants were charged with the items found during the search of the residence.

On cross-examination, Officer Sherrill confirmed that he never went to the front of the residence but instead proceeded directly to the back of the home. Despite being shown a picture of cinder-block steps at the front door, Officer Sherrill was positive that there were not any concrete cinder blocks used as steps for the front door, although he never visually checked that evening. Officer Sherrill further described the front of the residence, stating that there was "not a path going to the door." Officer Sherrill agreed that a "knock and talk" procedure usually occurred at the front door to a residence, if it was "[t]he most traveled way into the house . . . ."

Officer Sherrill further described the back of the residence, noting that there were two doors on the porch, "[a] sliding-glass door and a utility-room door[,]" and a set of steps to each door. According to Officer Sherrill, they were working on the flooring in the room behind the sliding glass door, and he entered the house through the other door, which was furthest from the driveway. Behind the sliding glass door was a dining room, then the kitchen separated from the dining room by a wall, and then the laundry or utility room. He further explained his decision about which door to use:

> Now, there was some stuff on the porch, and I can't remember if that's why I went to that door or if it was because of the light from the kitchen. There was only one light that I can remember being on in the house. When I went to that light where the kitchen was at, you could plainly see that the door was open . . . .

Officer Sherrill acknowledged that someone shining a flashlight into a home at that hour may startle its occupants. He went into the home yelling "sheriff's department."

He admitted that one could not see the burn pile or the back doors from the main road; however, he stated that the backyard was visible with binoculars from another nearby road. He further agreed that he had no knowledge of any arrest warrant for the Defendant at the time he entered the home.

When asked about the female individual who provided the information about the methamphetamine laboratory at the Defendant's home, Officer Sherrill stated, "She wasn't

---

[4] The Assistant District Attorney General stated in his closing summation that the Defendant, "[o]nce he was arrested, . . . was found to be in possession of almost [four] grams of methamphetamine[,] as well as the filters he used to strain that methamphetamine during the manufacturing process."

a creditable informant. She just gave us the information that stuff was there." Officer Sherrill agreed that he did not have enough information based upon her statements alone to secure a search warrant.

Officer Robertson also testified. He stated that he went to the front of the residence, which was dark, but there was a street light nearby, that "[t]he yard was probably a foot and a half tall[,]" and that there were "no tracks or anything going to the front door." Officer Robertson stated that the front door was about to the middle of his "waist to chest height off the ground," that there were no concrete blocks that evening stacked up in front of the door, and that "[i]t would have been very difficult for [him] to get in the front door [him]self." When asked why he was in the front yard, Officer Robertson said, "To make sure no one run [sic] out the windows and watching all the exits on that side of the house." He acknowledged that he did not knock on the front door nor did he smell any odor from the front of the residence.

The Defendant's mother, Kimberly Womack, testified that she and her mother own the manufactured home at 3084 K Parker Road and that her son resided at the home most of the time in March 2011. She described that the there was a long gravel driveway, approximately 200 feet in length, leading from the road to the residence. She further stated that there were cinder-block steps on March 26, 2011, and that "there [had] always been cinder blocks there." According to Ms. Womack, she used the cinder blocks numerous times "to go in and out [her]self[,]" and others also used those steps. She stated that "company" always came to the front door, including the occasional "Jehovah Witnesses . . . giving out bibles." She also stated that she knew several officers from the Cannon County Sheriff's Department, who had been to the residence, and that they used the front door. On the evening in question, March 26, the grass "was probably ankle tall" per Ms. Womack's testimony.

Ms. Womack stated that she parked "at the back because [she] work[ed] nights." She then described the backyard of her residence as a place where the family had cookouts and played games, such as volleyball and basketball. She stated that these events were usually held in the backyard for "privacy purposes[.]" Ms. Womack further testified that she used the burn pile to burn household items, and she estimated that the burn pile was approximately thirty-five to thirty-seven feet from the steps on the back porch or about seventy feet from "where someone would walk up to the trailer from the driveway[.]" Although there was no fence, there were "quite a few trees that surround[ed] the back of [the] residence" according to Ms. Womack. She opined that it was a "secluded area out in the country . . . ."

Ms. Womack claimed that she was unaware any methamphetamine was being sold or manufactured in her home. She was not present on the evening of March 26.

After taking the matter under advisement, the trial court entered an order, concluding that the "knock and talk" procedure at the back door of the residence was proper and that the ensuing search was conducted under exigent circumstances. Thereafter, the Defendant pled guilty to possession of less than .5 grams of methamphetamine with intent to sell or deliver, a Class C felony, and the remaining counts were dismissed.[5] Under the terms of the agreement, he received a sentence of six years, with sixty days to serve followed by probation. The Defendant also, pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(A), reserved the following certified question of law as a condition of his plea agreement:

> Whether the [p]olice [o]fficer had an implied license[6] to enter into the back yard of the Defendant's place of residence in the middle of the night without a warrant to conduct a "knock and talk" at the Defendant's back door and whether the [o]fficer's actions in observing the occupants through a back window exceeded any implied license, and whether sufficient exigent circumstances existed to support [p]olice [o]fficer's subsequent warrantless entry into the Defendant's place of residence through a back door, and therefore, whether any searches based on information gathered, whether by search warrant or arrest, were invalid.

(Footnote added). This appeal followed.

## ANALYSIS

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the

---

[5] There was also a judgment form entered dismissing the initiation to manufacture methamphetamine charge, which was Count 4 in the first indictment. However, the Defendant was not charged with this crime in the superseding indictment, and Count 4 in the superseding indictment was the possession of methamphetamine with intent to sell or deliver charge, which is the subject of this appeal. On the judgment form for this count of the superseding indictment was mistakenly written Count 5.

[6] The Defendant uses the term "implied license" in his certified question. However, that phrase is more typically used in the context of property law, and it appears that the better term would be "implied invitation" when discussing the validity of a "knock and talk" procedure. See State v. Harris, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995).

trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008) (citing State v. Scarborough, 201 S.W.3d 607, 615 (Tenn. 2006)). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. (citing State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007)). A trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. (citing State v. Hayes, 188 S.W.3d 505, 510 (Tenn. 2006)).

Here, the trial court made extensive findings of fact and conclusions of law in denying the Defendant's motion to suppress the evidence retrieved during the search of his residence. In denying the motion, the trial court made the following factual findings:

> The [c]ourt finds Officer James Sherrill with the Coffee County Sheriff['s] Department to be a credible witness. . . .
> . . . During the course of the search in 2010, . . . [Officer Sherrill] was admitted into the residence through the backdoor which lead into the laundry room. This is the same door through which he entered on the night of the search in question.
> On March 26, 2011, Officer Sherrill received information from a female, who had been involved in a traffic stop with another officer, that she had just left [the Defendant's] residence and was making methamphetamine. . . .
> There is a long gravel driveway leading up to the right side of the residence. Upon the officers' arrival, there were cars parked to the side and back of the residence. As depicted in the photo of the residence, . . . both the front and backyards are visible from the parking area portion of the driveway located on the right side of the residence, and there is equal access to the front and back of the residence from this area. The front and backyards of the residence are part of the curtilage.
> There is no path or sidewalk leading to the front door of the residence. There were no steps leading to the front door of the residence on the night of the search in question.
> Officer [Robertson], who the [c]ourt finds to be a credible witness, went to the front of the residence in an effort to cover all of the exits from the residence. . . . On the night of the search in question, the grass in the front yard was approximately a foot tall, and there was no sidewalk or pathway leading to the front door. In addition, there were no concrete blocks, or steps of any kind, leading to the front door.

. . . Even if these steps had been present on the night of the search, they would clearly not have been the primary access to the residence. These steps are very small and not permanently affixed to the structure. . . .

. . . The back steps and back doors of the residence, which were approached from the driveway and across the backyard, were clearly the primary access to the residence, and they were entrances to which the public was impliedly invited.

. . . There is nothing to obstruct the view of th[e] burn pile by someone entering the backyard to approach the step of the residence.

. . . [Officer Sherrill] shined his flashlight towards the pile and saw a Claritin D box lying on top of the pile. He approached the burn pile and saw a Coleman fuel can lying in the pile. . . .

Officer Sherrill did not unreasonably depart from or leave the area in which the public was impliedly invited to enter this residence.

. . . Officer Sherrill is familiar with the odor from the manufacture of methamphetamine. As he stood knocking at the door, he could smell this odor coming from the residence.

. . . Upon seeing [Officer Sherrill's] flashlight [shine through the kitchen window], [the Defendant] and the others jumped up from the table and ran. From previous experience, Officer Sherrill knew that suspects usually tried to dispose of drugs and other evidence by flushing it down the toilet. He entered the residence through the open door and started to secure the residence and prevent the destruction of evidence.

Upon entering the residence, the officers rounded up the suspects and did not place them in handcuffs. While rounding up the suspects, Officer Sherrill observed a white powdery substance on a plate in the living room. He believed this substance to be methamphetamine.

Based on these findings, the trial court then concluded as a matter of law,

[The Defendant] did not have an expectation of privacy in the area of his backyard leading to the back steps and the back door. The [c]ourt finds that Officer Sherrill's utilization of the back door of the residence for the "knock and talk" was not unreasonable and did not violate [the Defendant's] expectation of privacy.

. . . The items in the burn pile were in plain site as Officer Sherrill walked to the back door, and he could see the Claritin box. The [c]ourt finds that Officer Sherrill did not leave the area to which he was impliedly invited when he walked over the burn pile and looked at it.

When Officer Sherrill arrived at the back door of [the Defendant's] residence, smelled the odor of methamphetamine and saw the occupants scatter from the kitchen table, there was an urgent need for immediate action by Officer Sherrill without the delay inherent in obtaining a search warrant. Officer Sherrill needed to prevent the destruction of evidence and the possible escape of suspects. Thus, there were exigent circumstances that justified his entry into the residence and his detention of the Defendant and other occupants.

Thus, we are essentially presented with four questions for our appellate review: (1) Did Officer Sherrill enter the curtilage of the Defendant's home by entering the backyard?; (2) If Officer Sherrill entered the curtilage, did he do so pursuant to an implied invitation to knock on the back door?; (3) Was the subsequent entry inside the home justified by exigent circumstances?; and (4) If the entry was unlawful, was any of the evidence found through an independent source? Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. CONST. amend. IV; TENN. CONST. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). Such exceptions to the warrant requirement include "searches incident to arrest, plain view, exigent circumstances, and others, such as the consent to search." Talley, 307 S.W.3d at 729. These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)).

Courts have generally recognized the right of police officers to enter portions of a person's property that are implicitly open to the public for purposes of seeking an individual's consent to perform a search, and furthermore this court has expressly "recognize[d] that 'it is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business.'" State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003) (quoting 1 Wayne R. LaFave, Search and Seizure § 2.3(b) (3d ed. 1996)). Police officers conducting official business have the same rights as members of the general public, and as such they may enter any area of a person's property into which the general public is implicitly invited for purposes of pursuing legitimate business or social interests—such as a sidewalk or pathway leading from a public street to the front door of a residence—because individuals do not have a legitimate expectation of privacy in such areas. See, e.g., Harris, 919 S.W.2d at 624 ("What an officer sees from a vantage

point along the walkway between the public road and the front door is not protected by either the Fourth Amendment or the state constitution."); State v. Baker, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981) ("It cannot be said a person has an expectation of privacy in the area in the front of his residence which leads from the public way to the front door."). However, "[a]ny substantial and unreasonable departure from an area where the public is impliedly invited exceeds the scope of the implied invitation and intrudes upon a constitutionally protected expectation of privacy." Harris, 919 S.W.2d at 624 (quoting State v. Seagull, 95 Wash.2d 898, 632 P.2d 44, 47 (Wash. 1981)) (internal quotation marks and brackets omitted).

The "knock and talk" procedure is considered to be a consensual encounter with the police and a means for police officers "to request consent to search a residence." Cothran, 115 S.W.3d at 521. In explaining the procedure and the reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law.

Id. (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).

The trial court concluded, first, that the Defendant's back yard was curtilage but, then, that Officer Sherrill validly conducted the "knock and talk" at the back door, as this was the method of primary access to the residence. The curtilage surrounding the house merits the same constitutional protection as the home. State v. Prier, 725 S.W.2d 667, 671 (Tenn. 1987). The extent of the curtilage, and thereby the extent of constitutional protection, is measured according to two similar tests under the United States and Tennessee Constitutions. Under the Fourth Amendment of the United States Constitution, a court determines "whether the area in question is so intimately tied to the home itself" to warrant protection by considering four factors:

> [(1)] the proximity of the area claimed to be curtilage to the home, [(2)] whether the area is included within an enclosure surrounding the home, [(3)] the nature of the uses to which the area is put, and [(4)] the steps taken by the resident to protect the area from observation by people passing by.

-10-

United States v. Dunn, 480 U.S. 294, 301 (1987). Although Tennessee courts have not adopted these Dunn factors, they similarly define the extent of the curtilage under article I, section 7 of the Tennessee Constitution as "'the area around the home to which the activity of home life extends.'" Prier, 725 S.W.2d at 670-71 (quoting Oliver v. United States, 466 U.S. 170, 182 n.12 (1984)).

We agree with the trial court that the Defendant's backyard and two back doors were within the curtilage of his home for the purposes of both the Fourth Amendment and article I, section 7. Considering the Fourth Amendment test, the backyard was not visible to passerbys on the main road; in fact, one would have to travel the entire 200 hundred feet from the main road to the end of the gravel driveway in order to see the backyard. Ms. Womack said that there were "quite a few trees that surround[ed] the back of [the] residence" and described it as a "secluded area out in the country . . . ." Ms. Womack's testimony indicates that they used the area to relax and entertain guests, having cookouts and playing games. She stated that these events were usually held in the backyard for "privacy purposes[.]"

Once in the backyard, Officer Sherrill had to travel thirty-seven feet to the burn pile, used to burn household items, to verify its contents. He then had to walk up a set of steps to the two back doors of the residence. Those doors were covered by an awning, and the two stairways were connected by a deck. The deck was immediately attached to the house, and the two doors opened to it. A grill was on the deck, indicating that the family used the area for cooking. There were other household items strewn about the deck and the backyard, and Officer Sherrill testified that there was "stuff on the porch[.]" All these factors support the conclusion that the backyard and rear deck were intimately tied to the home and were, therefore, protected under the Fourth Amendment. See, e.g., State v. Stoney R. Anderson, II, No. M2011-01766-CCA-R3-CD, 2012 WL 2125992, at *7 (Tenn. Crim. App. June 12, 2012) (finding rear deck to be protected curtilage under facts similar to this case) (citing Hardesty v. Hamburg Twp., 461 F.3d 646, 652 (6th Cir. 2006)); State v. Rebecca Draper and J.C. Draper, No. E2011-01047-CCA-R3-CD, 2013 WL 1895869, at *4-5 (Tenn. Crim. App. May 24, 2013) (concluding that area behind a trailer home that was not viewable from the street or driveway and was obscured by trees and heavy brush was a part of the curtilage of the home). Furthermore, this same evidence, particularly the nature of the activities that occurred on the deck, demonstrated that these areas were those to which the activity of home life extended. Consequently, the Defendant also enjoyed the protection of article I, section 7 of the Tennessee Constitution to his backyard and rear deck.

The trial court additionally determined that the "knock and talk" encounter was proper because this was clearly the primary method of access to the residence. There is no bright line rule that an officer may never approach the back door of a house before first approaching

-11-

the front door. Such an action may be reasonable under certain circumstances. See, e.g., Brigham City v. Stuart, 547 U.S. 398, 406-07 (2006) (noting that knocking on the front door would have been futile and holding that officers did not violate the Fourth Amendment by entering back door when a fight was underway inside); State v. Gregory Todd Whitaker and David Paul Coffey, No. E2012-00253-CCA-R3-CD, 2013 WL 3353334, at *5 (Tenn. Crim. App. June 28, 2012) (holding that "knock and talk" encounter was proper at rear sliding glass door of a trailer home when the driveway led to the back area of the home, there were cars parked in front of the porch, and the porch appeared to be the only functional entrance to the home), perm. app. denied, (Tenn. Oct. 16, 2013).

The State relies in large part on this court's holding in Whitaker, urging us to uphold the officers' actions in this case of conducting the "knock and talk" at the back door of the Defendant's residence. The State correctly points out that the fact that the encounter occurred at night does not per se invalidate a "knock and talk," but is instead a factor to be considered in conjunction with the other circumstances surrounding the encounter. See Whitaker, 2013 WL 3353334, at *5 (citation omitted). However, there are several key factual differences from Whitaker and the present case. The "knock and talk" here occurred shortly after 2:36 a.m., and no lights were visible from the front of residence. Moreover, the only light visible from the residence came from the kitchen window, seen only once in the backyard. In Whitaker, the "knock and talk" occurred around 10:00 p.m., and lights were on in the house. Id. at *1. Here, any member of the public would be hard pressed to believe that they were impliedly invited to visit the Defendant's residence, which was dark inside, at the back door at 2:36 a.m. See Anderson, 2012 WL 2125992, at *8 (citing Harris, 919 S.W.2d at 623-24 (explaining that police, as members of the public, are impliedly invited to the front door of a residence)).

This is not changed by the fact that Officer Sherrill had been to the residence before in search of drugs and was shown in through the back door. He had a warrant on that occasion, which does not impact the scope of the implied invitation to the residence. Although Officer Sherrill had received a tip of methamphetamine being manufactured inside the residence, he agreed that the tip was unreliable. In Whitaker, the odor of marijuana was immediate when officers exited their police cars. Id. at *1. In this case, Officer Robertson testified that he stationed himself at the front of the residence to block all exits of escape, so clearly he was able to approach the front door of the residence and believed someone might run out that door. Because the deputies intruded on this constitutionally protected area of the Defendant's home, and because they exceeded the scope of the implied invitation to the general public, we conclude that they violated the mandates of the United States and Tennessee Constitutions.

-12-

The trial court also determined that there were exigent circumstances that justified Officer Sherrill's actions in entering the residence, mainly the smell of methamphetamine and the possible destruction of evidence. Exigent circumstances "are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." State v. Meeks, 262 S.W.3d 710, 723 (Tenn. 2008). Put another way, exigent circumstances arise when "the needs of law enforcement are so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Id. (quoting Brigham City, 547 U.S. at 403) (internal quotation marks and brackets omitted). Exigent circumstances exist only when "the State has shown that the search was imperative." Id. Exigent circumstances frequently arise in the following situations: "(1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." Id.

In determining the constitutionality of a warrantless search, "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." Meeks, 262 S.W.3d at 723. "The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry." Id. The State "must rely upon specific and articulable facts and the reasonable inferences drawn from them" rather than on mere speculation. Id. at 723-24.

Police-created exigent circumstances cannot be used to justify a warrantless entry into a constitutionally protected area. State v. Carter, 160 S.W.3d 526, 532 (Tenn. 2005). Additionally, the "manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone." Meeks, 262 S.W.3d at 724. When the asserted exigency is risk to the safety of the officers or others, "the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm." Id.

Officer Sherrill's testimony at the suppression hearing was clear that he did not smell the methamphetamine odor until he had already entered the Defendant's curtilage and walked onto the rear deck of the residence. In essence, Officer Sherrill created the exigency by entering into the Defendant's backyard. See, e.g., Draper, 2012 WL 1895869, at *7 (finding no exigency under similar circumstances). Moreover, there was no threat of destruction of evidence until Officer Sherrill knocked on the kitchen window. See Whitaker, 2013 WL 3353334, at *6 (holding that, when there was nothing to suggest that the evidence was in danger of being destroyed by the occupants of the house, the officers created the exigency).

-13-

We conclude, contrary to the trial court, that such police-created exigent circumstances in this case cannot be used to justify a warrantless entry into a constitutionally protected area.

Finally, the State argues that, even if the officers' entry into the Defendant's home was unlawful, such entry did not taint the evidence because the "overwhelming majority of the information contained in the affidavit [for the search warrant] was obtained prior to the entry into the Defendant's residence." Thus, according to the State, the evidence was seized by virtue of a valid search warrant, regardless of any illegality in the officers's entry.

Almost simultaneously with the creation of the exclusionary rule, the United States Supreme Court developed the "independent source" doctrine. See Murray v. United States, 487 U.S. 533, 537-39 (1988). This doctrine permits the State to utilize any evidence that would otherwise be suppressed pursuant to the exclusionary rule if that evidence is obtained through an independent, lawful search or from other "activities untainted by the initial illegality." Id. at 537. The rationale behind the development of this doctrine is that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred." Nix v. Williams, 467 U.S. 431, 443 (1984). The independent source doctrine also applies to claims brought under the Tennessee Constitution. State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992).

Following the independent source doctrine, "an unconstitutional entry does not compel exclusion of evidence found within a home if that evidence is subsequently discovered after execution of a valid warrant obtained on the basis of facts known entirely independent and separate from those discovered as a result of the illegal entry." Id. at 600 (citing Segura v. United States, 468 U.S. 796, 813-14 (1984)). However, in accordance with our holdings above, we disagree with the State that the majority of the evidence used in the affidavit to secure the search warrant was obtained prior to the officers' unlawful entry onto the curtilage of the Defendant's property. When the officers arrived at the Defendant's home, the only information they possessed was from an unreliable informant that methamphetamine was being manufactured there. Officer Sherrill stated that he did not believe this was enough to secure a warrant. Therefore, the search warrant, and the resulting proceeds of the search of the home, were invalid.

Nonetheless, "even if the initial contact was an unlawful seizure, evidence discovered through a subsequent legal arrest based on independent probable cause is admissible." See State v. Sammie Lee Taylor, No. 02C01-9501-CR-00029, 1996 WL 580997, at *13 (Tenn. Crim. App. Oct. 10, 1996) (citing New York v. Harris, 495 U.S. 14, 19 (1990); Murray, 487 U.S. at 537; Segura, 468 U.S. 796 at 799). The "independent source doctrine" permits the

-14-

introduction of such evidence because the evidence does not result from the exploitation of a defendant's Fourth Amendment rights and because the State should not be put in a worse position simply because of unrelated police error or misconduct. See Murray, 487 U.S. at 537-38. The probable cause for the Defendant's arrest in this case was developed independently of, although contemporaneously with, the illegal search. The drugs seized from his person, the basis for his guilty plea, were seized incident to his lawful arrest for passing worthless checks.[7] Accordingly, we must agree that the trial court properly admitted the evidence found on the Defendant's person that was obtained pursuant to an independent, valid arrest warrant. See, e.g., United States v. Calhoun, 49 F.3d 231, 234 (6th Cir. 1995) (defendant's voluntary consent to search, subsequent to illegal sweep of apartment, provided independent source for seizure of evidence).

## CONCLUSION

In summary, we conclude that, although the entry into the Defendant's backyard and the subsequent search of the Defendant's residence was unlawful, the trial court did not err by denying the motion to suppress the drugs found on the Defendant's person that were discovered pursuant to a search incident to his valid arrest on other charges. Accordingly, because all parties agree that the issue is dispositive of the case, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[7] On appeal, there is no challenge to the validity of the arrest warrants, although such an argument was made in the trial court.